**COMMONWEALTH OF MASSACHU-SETTS by its LOW–LEVEL RADIOAC-TIVE WASTE MANAGEMENT BOARD, Plaintiff,**

v.

**The Honorable Hazel O'LEARY, in her official capacity as Secretary of Energy of the United States, and United States Department of Energy, Defendants.**

No. 95–11670.

United States District Court,
D. Massachusetts.

March 29, 1996.

---

Thomas A. Barnico, Attorney General's Office, Boston, MA, William Porter, Office of the Attorney General, Boston, MA, Commonwealth of Massachusetts, Plaintiff.

Thomas Millet, Department of Justice, Federal Programs Branch, Civil Division, Washington, DC, Marcia K. Sowles, U.S. Department of Justice, Civil Division, Washington, DC, Frank W. Hunger, U.S. Department of Justice, Civil Division, Washington, DC, for Hazel O'Leary, Defendant.

## MEMORANDUM AND ORDER

SARIS, District Judge.

### INTRODUCTION

This dispute arises under the Low–Level Radioactive Waste Policy Amendments Act of 1985 ("The 1985 Act"), 42 U.S.C. § 2021b *et seq.* The Massachusetts Low–Level Radioactive Management Board brings this declaratory judgment action pursuant to 28 U.S.C. § 2201, claiming it is entitled to certain escrow funds held by the United States Department of Energy ("DOE"), pursuant to 42 U.S.C. § 2021e(d)(2)(B)(iv).

After hearing, the Court *ALLOWS* defendant's motion for summary judgment, *DENIES* plaintiff's motion for summary judgment, and *DENIES* plaintiff's motion for a preliminary injunction to stay payment of surcharge rebates.

### FACTUAL BACKGROUND

#### A. *The Statutory Scheme*

Congress enacted the Low–Level Radioactive Waste Policy Act Amendments of 1985, 42 U.S.C. § 2021b *et seq.*, to encourage states and regional compacts to develop low-level radioactive waste ("LLRW") disposal sites. *See generally New York v. United States,* 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) (discussing the legislative history of the Act). The Act provides: "Each state shall be responsible for providing, either by itself or in cooperation with other States, for the disposal of ... low-level radioactive waste generated within the State." 42 U.S.C. § 2021c(a)(1)(A). The Act authorized the states to develop regional compacts to develop disposal facilities for LLRW, § 2021d(a)(2), and required the three then-existing disposal sites—those in Nevada, Washington and South Carolina—to make disposal capacity available for LLRW generated from most sources until 1992. § 2021e(a)(2). The Act permitted those three sites to exact graduated surcharges for LLRW arriving from outside the state's regional compact. § 2021e(d)(1).

The Act established chronological milestones to ensure that each state or compact moved toward the goal of providing for the disposal of its own LLRW. As a carrot, Congress provided certain monetary benefits to the states which met the statutory milestones by certain dates. One quarter of the

surcharges collected by the three sited states was to be transferred to an escrow account held by the Secretary of Energy, who was to make payments from the account as states met the milestones. § 2021e(d)(2)(A).

The statutory milestones were as follows: By July 1, 1986, each state was to have ratified legislation either joining a regional compact or indicating an intent to develop a disposal facility within the state. § 2021e(e)(1)(A); § 2021e(d)(2)(B)(i). By January 1, 1988, each stand-alone state or compact was to have developed a siting plan. By January 1, 1990, each state or compact was to either (1) file a complete application for a license to operate a disposal site, or (2) provide a certification that the state would be capable of disposing of all LLRW generated in the state after 1992. § 2021e(e)(1)(C); § 2021e(d)(2)(B)(iii). The final disbursement of the escrowed surcharge funds was to be made "to those States or compacts able to dispose of low level radioactive waste generated within their borders by January 1, 1993." *New York v. United States*, 505 U.S. at 153, 112 S.Ct. at 2416. The language of the statute is as follows:

> The [escrowed surcharges] shall be paid by the Secretary in accordance with subparagraph (D) if, by January 1, 1993, the State in which such waste originated (or its com-

pact region, where applicable) is able to provide for the disposal of all low-level radioactive waste generated within such State or compact region.
§ 2021e(d)(2)(B)(iv).

The Act provides that rebate payments "shall be paid within 30 days after the applicable date." § 2021e(d)(2)(D). The Act designates the Secretary to act as trustee for the surcharge escrow account, § 2021e(d)(2)(A), and provides that "the funds shall not be the property of the United States." § 2021e(d)(2)(B)(iv). If a state was unable to provide for the disposal of its own radioactive waste by January 1, 1993, and declined to take title to its waste, then the funds held in trust were to be repaid by the Department of Energy, with interest, to the generators of the waste, over a thirty-six month period beginning February 1, 1993. § 2021e(d)(2)(C).[1] If a state missed the January 1, 1993 deadline, but made provisions before January 1, 1996, it would receive a portion of the rebate pro-rated over the three-year period. § 2021e(d)(2)(C).[2]

If a state or regional compact failed to provide for the disposal of all LLRW generated within its borders by January 1, 1996, the Act directed the state, upon request of the generator or owner of the waste, to take

---

**1.** Failure to meet January 1, 1993 deadline. If, by January 1, 1993, a State (or, where applicable, a compact region) in which low-level radioactive waste is generated is unable to provide for the disposal of all such waste generated within such State or compact region—

> (i) each State in which such waste is generated, upon the request of the generator or owner of the waste, shall take title to the waste, shall be obligated to take possession of the waste, and shall be liable for all damages directly or indirectly incurred by such generator or owner as a consequence of the failure of the State to take possession of the waste as soon after January 1, 1993 as the generator or owner notifies the State that the waste is available for shipment; or (ii) if such State elects not to take title to, take possession of, and assume liability for such waste, pursuant to clause (i), twenty-five per centum of any amount collected by a State under paragraph (1) for low-level radioactive waste disposed of under this section during the period beginning January 1, 1990 and ending December 31, 1992 shall be repaid, with interest, to each generator from whom such surcharge was collected. Repayments

made pursuant to this clause shall be made on a monthly basis, with the first such repayment beginning on February 1, 1993, in an amount equal to one thirty-sixth of the total amount or required to be repaid pursuant to this clause, and shall continue until the State (or, where applicable, compact region) in which such low-level radioactive waste is generated is able to provide for the disposal of all such waste generated within such State or compact region or until January 1, 1996, whichever is earlier. 42 U.S.C. § 2021e(d)(2)(C).

**2.** If a State (or, where applicable, a compact region) in which low-level radioactive waste is generated provides for the disposal of such waste at any time after January 1, 1993 and prior to January 1, 1996, such State (or, where applicable, compact region) shall be paid in accordance with subparagraph (d) a lump sum amount equal to twenty-five per centum of any amount collected by a State under paragraph (1): Provided, however, That such payment shall be adjusted to reflect the remaining number of months between January 1, 1993 and January 1, 1996 for which such State (or, where applicable, a compact region) provides for the disposal of such waste.

title to the waste. § 2021e(d)(2)(C).[3] Although the Supreme Court determined that this take-title provision was unconstitutional, it held it to be severable and upheld the remaining provisions of the Act. *New York v. United States*, 505 U.S. at 186–87, 112 S.Ct. at 2433–34.

## B. *Undisputed Facts*

Construing the facts in the light most favorable to Massachusetts, the Court treats the following facts as undisputed. Massachusetts met the first three milestones, and received its corresponding share of the escrow funds. In June of 1992, South Carolina authorized its disposal site at Barnwell to continue accepting LLRW from generators outside of the boundaries of the Southeast Interstate LLRW Management region. However, South Carolina only allowed the site to accept LLRW from states who entered into eighteen-month contracts with the Southeast Interstate Compact Commission.

In July of 1992, Terry Plummer, the manager of DOE's LLRW Program, attended a meeting of the Low–Level Radioactive Waste Forum (the "Forum"). The Forum is an organization comprised of representatives of the various states and Compacts having responsibility for LLRW within their state or geographic region. Carol C. Amick, the Executive Director of the Massachusetts Low–Level Radioactive Waste Management Board also attended that meeting of the Forum. At the meeting, Mr. Plummer discussed the DOE's policy with respect to the final January 1, 1993 milestone. Mr. Plummer indicated that the DOE would consider states that entered into eighteen-month contracts with the Southeast Interstate Compact Commission beginning on January 1, 1993, to have met the January 1, 1993 milestone and be eligible for the full surcharge rebate associated with that milestone. Mr. Plummer also

indicated that the DOE would soon issue regulations in the *Federal Register* that would address the surcharge rebate procedures, and that interested parties would be allowed forty-five days to submit comments on the regulations.

A *Federal Register* notice was issued on September 30, 1992, under the title "Surcharge Rebates: Eligibility Criteria and Procedures for the January 1, 1993 Deadline of the Low–Level Radioactive Waste Policy Act Amendments of 1985." 57 Fed.Reg. 45,248 (1992). The relevant language of the notice provided that to be eligible for surcharge rebates, states must either have a LLRW disposal site or "[a] valid contract with another State or compact region for the disposal or storage of all LLRW." *Id.* Comments were requested. In December of 1992, Massachusetts entered into an eighteen-month contract with the Southeast Interstate Compact Commission. *Id.* The contract could be cancelled at will by either party with sixty days notice.

In February of 1993, Massachusetts submitted a copy of its contract with the Southeast Interstate Compact Commission to DOE and requested full payment for meeting the January 1, 1993 milestone. On March 31, 1994, DOE published another notice in the *Federal Register* entitled "Surcharge Rebates: Notice of Response to Comments on Draft Policies and Procedures, and Final Policies and Procedures." 59 Fed.Reg. 15,188. Because access to the Barnwell site was limited to 18 months, waste generators had, in response to the September 1992 notice, submitted comments opposing surcharge rebates.[4] *Id.* at 15,190. The 1994 notice acknowledged that the language of the Act did not expressly specify the duration of the period for which a non-sited state must "be able to provide for the disposal" of LLRW to get the rebate. *Id.* at 15,191. Nonetheless,

---

**3.** If a State (or, where applicable, a compact region) in which low-level radioactive waste is generated is unable to provide for the disposal of all such waste generated, upon the request of the generator or owner of the waste, shall take title to the waste, be incurred by such generator or owner as a consequence of the failure of the State to take possession of the waste as soon after January 1, 1996, as the generator or owner

notifies the State that the waste is available for shipment.

**4.** Because both the 1992 and the 1994 notices were interpretive rules, there was no legal requirement of notice and comment. *See* 5 U.S.C. § 553(b)(3)(A) (exempting interpretive rules from notice and comment requirements of the Administrative Procedure Act).

862

upon review, the DOE decided that states which had entered into eighteen-month contracts with the Southeast Compact Commission would only be eligible for a partial payment for the January 1, 1993 milestone, prorated over the period from January 1, 1993 to January 1, 1996.

On April 28, 1994, Massachusetts sent another letter to the DOE requesting payment of the entire amount applicable to meeting the January 1, 1993 milestone. On September 1, 1994, the DOE paid Massachusetts $445,346.97, one-half of the escrow funds associated with Massachusetts' meeting the January 1, 1993 milestone. Subsequently, Massachusetts filed this action. The DOE has expressed an intention to release the funds by April 15, 1996, and the Commonwealth has filed a motion for a preliminary injunction.

## DISCUSSION

### A. *Summary Judgment Standard*

"Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Barbour v. Dynamics Research Corp.*, 63 F.3d 32, 36 (1st Cir.1995) (quoting Fed.R.Civ.P. 56(c)), *cert. denied,* —— U.S. ——, 116 S.Ct. 914, 133 L.Ed.2d 845 (1996). "To succeed [in a motion for summary judgment], the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir. 1990); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986).

"Once the moving party has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who 'may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial.'" *Barbour*, 63 F.3d at 37 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986)). "There must be 'sufficient evidence

favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.'" *Rogers*, 902 F.2d at 143 (quoting *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2511) (citations and footnote in *Anderson* omitted). The Court must "view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Barbour*, 63 F.3d at 36.

### B. *Legal Discussion*
#### 1. *Statutory Construction*

■ The sole dispute is how long after January 1, 1993 a state must be able to provide for disposal of all its LLRW in order to meet the January 1, 1993 milestone and be entitled to full payment of the 25 percent rebate pursuant to Section 2021e(d)(2)(B) and (D). The March 1994 DOE notice states that unless the state can provide for disposal for the entire three year period from January 1, 1993 to December 31, 1995, the state will only receive a partial refund. Massachusetts argues it is entitled to full reimbursement so long as it had a contractual commitment for disposal of all its LLRW by January 1, 1993, even if the contractual commitment spanned only eighteen months.

■ A court owes deference to agency interpretations of ambiguous statutory provisions. In *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 841, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984), the Supreme Court explained:

When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the stat-

ute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

A court need not conclude "that the agency's construction was the only reasonable one or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Federal Election Commission v. Democratic Senatorial Campaign Committee,* 454 U.S. 27, 39, 102 S.Ct. 38, 46, 70 L.Ed.2d 23 (1981). In fact, agency interpretations of statutes are controlling "unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron,* 467 U.S. at 844, 104 S.Ct. at 2782.

In construing the Act, this Court is not writing on a clean slate. The courts in *Central Midwest Interstate Low–Level Radioactive Waste Comm'n v. O'Leary,* 858 F.Supp. 114, 118 (C.D.Ill.1994) and *Appalachian States Low–Level Radioactive Waste Comm'n v. O'Leary* (Civil Action No. 3:CV–94–1033) (M.D.Pa., May 22, 1995), *appeal pending,* No. 95–7382 (3d Cir.), have already addressed the issue. While they reached opposite conclusions as to the appropriate statutory interpretation, both courts agreed that the Act does not specify for how long a state must have made provision for all its LLRW to satisfy the January 1, 1993 milestone. *Central Midwest,* 858 F.Supp. at 117 (although the Act stated that it applied to all radioactive waste generated after December 31, 1992, the statute did not answer the question "for how long after that date?"); *Appalachian States,* slip op. at 11 (granting that "the pertinent language of the Act could be more explicit"). This Court agrees that the statutory language is ambiguous with respect to this issue.

Having determined that the statute does not speak clearly to the question at issue, this Court must decide whether DOE's interpretation is based on a permissible construction of the statute. This Court concurs with the *Central Midwest* court that the DOE interpretation of the *unclear* statutory provision is "entirely reasonable." Indeed, if faced with the issue *de novo,* this Court

would reach the same result. The analysis of the *Central Midwest* court bears repetition:

> Section 2021e(d)(2)(B)(iv), though, does not specify for how long a state must have made provision for the disposal of its waste. Based on the language of 42 U.S.C. § 2021e(d)(2)(C), it appears that there is a three-year monitoring period of each state's disposal ability, beginning in January of 1993. Under § 2021e(d)(2)(C), if a state or compact region has failed to provide for disposal of its waste by the target date, it is still entitled to receive a portion of the 25% rebate, if, during some time prior to January 1, 1996, it makes provision for the disposal of its radioactive waste. Since payments to the utility generators are made on a monthly basis under 42 U.S.C. § 2021e(d)(2)(C)(ii), those payments can be stopped during the three-year period, and a pro rata lump sum amount can be paid to the state or compact region for the remaining time for which it has made provision for the storage of its nuclear waste.
>
> Here, the Department of Energy has interpreted § 2021e(d)(2)(C) conversely to mean that a utility generator is entitled to receipt of part of the rebate if during the three-year monitoring period a compact region becomes unable to provide for the disposal of its radioactive waste. The Court finds this interpretation of the statute to be entirely reasonable.

*Central Midwest,* 858 F.Supp. at 118.

The alternative to the three-year monitoring period is the "snapshot approach." The Court in *Appalachian States* appeared to support the "snapshot" approach, reasoning:

> Under the Act, January 1, 1993 is the critical deadline, or "Milestone." If *by* January 1, 1993, a state or compact is able to provide for the disposal of all their LLRW, then it is to receive a full rebate of the escrowed fees. 42 U.S.C. § 2021e(d)(2)(B)(iv). There is no mention of a pro rata reduction in this section, nor is there an indication that the language, "provide for the disposal of" means to have a contract with a duration stretching over the entire 1993–1996 period. The year

1996 is not even included in section 2021(e)(2)(B)(iv).

*Appalachian States,* slip op. at 10–11. Under this interpretation, a state which develops a contractual solution which would dispose of all LLRW generated within its borders on January 1, 1993, but only for that day, would be entitled to the full rebate. Yet, as *Central Midwest* recognized, the Act explicitly provides that a state which failed to make arrangements by January 1, 1993, but was subsequently able to dispose of all LLRW for some period prior to 1996, would be entitled only to a pro rata share. § 2021e(d)(2)(C). The "snapshot" approach thus leads to an anomalous result: a state that provided for the disposal of all waste generated on January 1, 1993 then left the generators to make their own arrangements thereafter would be entitled to a full rebate, while a state that missed the deadline but made arrangements for the remainder of the three years would receive only a pro rata refund. Under the Secretary's interpretation, on the other hand, a state would be entitled to a pro rata refund for the portion of the three-year period during which it provided for disposal of its waste, whether at the beginning or the end of the three years.

The Secretary's interpretation of the statute is more reasonable in light of the entire legislative scheme and the statutory purpose of encouraging states to "comply with their statutory obligation to provide for the disposal of waste generated within their borders." *New York v. United States,* 505 U.S. at 152, 112 S.Ct. at 2416. Congress contemplated permanent solutions, as evidenced by the attempt to require states to take title to and assume liability for all waste generated in their state. *See* § 2021e(d)(2)(C). In fact, the September 1992 notice announcing that the DOE would accept a contract for disposal at a site outside the state or compact in satisfaction of the January 1, 1993 milestone,

resolves an ambiguity in the meaning of the term "disposal" in the state's favor. *See* § 2021b(7) ("The term 'disposal' means the permanent isolation of low-level radioactive waste....").[5] It was as a result of this determination to accept contracts that the ambiguity of the Act with respect to duration first surfaced.

■ Massachusetts urges the Court to give less deference to the Secretary's interpretation of the Act because she waffled on the duration requirements. "An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is entitled to considerably less deference than a consistently held agency view." *Good Samaritan Hosp. v. Shalala,* 508 U.S. 402, 113 S.Ct. 2151, 2161, 124 L.Ed.2d 368 (1993) (quoting *I.N.S. v. Cardoza–Fonseca,* 480 U.S. 421, 446 n. 30, 107 S.Ct. 1207, 1221 n. 30, 94 L.Ed.2d 434 (1987)). There is however no inconsistency in the agency's published interpretations of the statute. The September 1992 *Federal Register* notice did not address the issue of whether a contract for less than three years would qualify a State for full payment of the escrow funds. That notice addressed the issue of whether contracts in general, in lieu of a State building its own LLRW disposal site or joining a Compact with a LLRW disposal site, could satisfy the requirements of the Act. As with the Act itself, the 1992 notice was ambiguous as to duration. The March 1994 *Federal Register* notice then fleshed out details about how DOE would treat contracts of different durations. These notices are therefore not in conflict.

■ Massachusetts also argues that the statement made by Terry Plummer at the July 1992 meeting of the Forum constitutes an announcement of an official DOE position that conflicts with the position published in the March 1994 *Federal Register.* The rec-

5. The recent news report that Massachusetts has given up trying to find an in-state LLRW disposal site only serves to emphasize that the eighteen-month contract was not a temporary stop-gap solution to enable the state to develop a permanent disposal mechanism. *See Boston Globe,* Mar. 28, 1996, at 40 (noting that Massachusetts "yesterday formally suspended its two-year-old search for a place in Massachusetts to dispose of low-level radioactive waste" and that the waste "will continue to be shipped to South Carolina"). The Act was designed to encourage states to develop a long range disposal system of its own LLRW, and combat the not-in-my-back-yard approach to LLRW disposal.

ord is unclear as to whether Mr. Plummer's statement, which is undisputed, was an agency position. *Cf. Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212, 109 S.Ct. 468, 473–74, 102 L.Ed.2d 493 (1988) (declining to give deference to an agency counsel's interpretation of a statute where the agency itself has articulated no position on the question). However, even assuming that Mr. Plummer's oral statement was an authorized position of the Secretary, "an administrative agency is not disqualified from changing its mind; and when it does, the courts still sit in review of the administrative decision and should not approach the statutory construction *de novo* and without regard." *Good Samaritan*, 508 U.S. at 417, 113 S.Ct. at 2161. Although a conflicting earlier position does reduce the deference this Court must give to the later position, "where the agency's interpretation of a statute is at least as plausible as competing ones, there is little, if any, reason not to defer to its construction." *Id.* at 415–18, 113 S.Ct. at 2160–62 (deferring to the agency's current construction even though "over the years the agency has embraced a variety of approaches"). Moreover, a court "should be especially reluctant to reject the agency's current view" when it "closely fits 'the design of the statute as a whole and ... its object and policy.'" *Id.* (quoting *Crandon v. United States*, 494 U.S. 152, 158, 110 S.Ct. 997, 1001, 108 L.Ed.2d 132 (1990)).

Here, the Secretary's interpretation should be afforded some weight as Congress made her the trustee of the funds. In addition, there is no concern here that the Secretary's interpretation was colored by a monetary interest in the result, as any funds not disbursed with interest to the state will be refunded with interest to the generators who paid the surcharge. *Cf. Massachusetts v. Secretary of Health and Human Services (HHS)*, 749 F.2d 89, 95 (1st Cir.1984) (noting that "the Secretary's obvious pecuniary stake in this case is bound to heighten our scrutiny of her reading of the statute"), *cert. denied*, 472 U.S. 1017, 105 S.Ct. 3478, 87 L.Ed.2d 613 (1985).

■ To the extent Massachusetts argues that the DOE should be equitably estopped from promulgating an interpretation of the Act different from that advanced by Terry Plummer at the July 1992 meeting of the Forum, the argument also fails. The traditional elements of equitable estoppel include reasonable reliance on a misrepresentation and some detriment, from the misrepresentation, to the party seeking to assert the estoppel. *Falcone v. Pierce*, 864 F.2d 226, 228 (1st Cir.1988). Yet, even if Mr. Plummer's statement had been a misrepresentation, the record and pleadings do not reflect any detriment experienced by Massachusetts as a result of reliance on the statement. Massachusetts has not alleged that it had any option other than signing the eighteen-month contract with the Southeast Interstate Compact Commission. How else was it going to meet its statutory obligation of disposing of its LLRW? There is no evidence that the State could have taken different steps, either before signing the contract or at the contract's expiration, had Mr. Plummer indicated that the eighteen-month contract would not fully satisfy the milestone.

### 2. *The Spending Clause*

■ Massachusetts also argues that the March 1994 *Federal Register* notice imposed a new condition on federal funding and therefore violated the Spending Clause, U.S. Const., Art. I, § 8, cl. 1. The Supreme Court has long held that in legislation enacted pursuant to the spending power, "if Congress intends to impose a condition on the grant of federal monies, it must do so unambiguously." *Pennhurst State School v. Halderman*, 451 U.S. 1, 17, 101 S.Ct. 1531, 1540, (1981); *see also New York v. United States*, 505 U.S. at 171–73, 112 S.Ct. at 2425–27 (holding that DOE's disbursements from the escrow fund under the LLRW Act are "federal spending" under the Spending Clause). However, *Pennhurst* involved only the question whether Congress had "imposed an obligation on the States to spend state money to fund certain rights as a condition of receiving federal moneys under the Act or whether it spoke merely in precatory terms." *Pennhurst*, 451 U.S. at 18, 101 S.Ct. at 1540. *Pennhurst* held that a general statement of "findings" in a funding statute was insufficient to create substantive rights in favor of the beneficiaries of the funds, not because its

*terms* were ambiguous, but because it was not unambiguously designated a condition at all. *Id.* at 22–23, 101 S.Ct. at 1542–43; *see also American Hospital Ass'n v. Schweiker,* 721 F.2d 170, 183 (7th Cir.1983) (distinguishing *Pennhurst* as involving "whether enforceable obligations were created" rather than "the scope and interpretation of those obligations"), *cert. denied,* 466 U.S. 958, 104 S.Ct. 2169, 80 L.Ed.2d 553 (1984); *Kentucky v. Donovan,* 704 F.2d 288, 300 n. 17 (6th Cir.1983) ("We do not read *Pennhurst,* which involved the issue as to whether a particular grant of funds was conditional at all, to require Congress to expressly provide for each and every detail of a spending program.").

Here there is no dispute that the milestones were conditions for receipt of the rebates. *See New York v. United States,* 505 U.S. at 172, 112 S.Ct. at 2426 (stating that "the conditions imposed are unambiguous"). Rather, as in *Massachusetts v. HHS,* 749 F.2d at 95, the issue here "involves the construction and enforcement of a narrow statutory provision"—whether a contract of limited duration will suffice to meet the January 1, 1993 milestone. In *Massachusetts v. HHS,* the First Circuit upheld an agency's interpretation of an ambiguous statutory provision to disallow federal reimbursement of Medicaid payments Massachusetts had already made to nursing homes. *Id.* at 92. In rejecting Massachusetts' Spending Clause challenge, the Court explained that *Pennhurst* does not require "that every arguably ambiguous provision conditioning the receipt of federal funds by a state be construed in the state's favor." *Id.* at 95.

### 3. *Retroactive Rulemaking Claim*

■ Finally, Massachusetts argues that the March 1994 *Federal Register* notice was impermissible retroactive legislative rulemaking under *Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988). *Bowen v. Georgetown* held that "a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms." *Id.* at 208, 109 S.Ct. at 472. Unlike the regulation at issue in *Bowen v. George-*

*town,* the 1994 DOE notice is an interpretive rather than a legislative rule. *See Health Insurance Ass'n v. Shalala,* 23 F.3d 412, 423 (D.C.Cir.1994) (agency determinations that did not rest on a delegation of legislative authority to the agency but rather "reflect[ed] the Secretary's elucidation of rights and duties created by Congress" were interpretive), *cert. denied,* —— U.S. ——, 115 S.Ct. 1095, 130 L.Ed.2d 1064 (1995). As discussed above, the Secretary's 1994 notice was merely an interpretation of an ambiguous provision of the Act, drawing support from the structure and purpose of the Act itself. Massachusetts' obligations were imposed by the Act, not by a legislative rule of the DOE.

■ A court "cannot dismiss the problem of retroactivity, however, merely because we are dealing with the interpretation" of a statute. *Cheshire Hosp. v. New Hampshire–Vermont Hosp. Serv.,* 689 F.2d 1112, 1121 n. 10 (1st Cir.1982). On the other hand, "not every law that upsets expectations is invalid; courts have generally compared the public interest in the retroactive rule with the private interests that are overturned by it." *Id.* (quoting *Adams Nursing Home of Williamstown, Inc. v. Mathews,* 548 F.2d 1077, 1080 (1st Cir.1977)). "[A] critical consideration is the extent to which a retroactive rule or interpretation adversely affects the reasonable expectations of concerned parties." *Id.; see also Alvarado Parkway Inst., Inc. v. Mendez,* 789 F.Supp. 1190, 1195 (D.D.C.1992) ("Because existing obligations remain unchanged, the retroactive effect of an interpretive rule has been upheld when reasonable.").

Any retroactive effect of the Secretary's interpretation is reasonable under these circumstances. *Cf. Landgraf v. U.S.I. Film Products,* 511 U.S. 244, ——, 114 S.Ct. 1483, 1499, 128 L.Ed.2d 229 (1994) (explaining that "familiar considerations of fair notice, reasonable reliance, and settled expectations offer sound guidance" to courts deciding issues of retroactivity). The Secretary has not sought to retract payments already made. Nor has the Secretary "surprised" Massachusetts with retroactive conditions imposed after the

receipt of funds. *Pennhurst*, 451 U.S. at 25, 101 S.Ct. at 1544.

Prior to the March 1994 notice, there was no settled expectation that the January 1, 1993 milestone could be met by an eighteen-month contract. *See Cheshire Hospital*, 689 F.2d at 1121–22 (holding that there was no settled law allowing reimbursement for interest despite a letter from the Secretary's "fiscal intermediary" stating that such interest would be allowed). Massachusetts argues it reasonably relied on the statements of Mr. Plummer in expecting that an eighteen month contract would suffice to trigger the surcharge rebate. However, these statements were oral. The failure of the September 30, 1992 notice to discuss the contractual duration requirements and its request for comments undercut any argument of "settled expectations." In sum, "[a] rule simply clarifying an unsettled or confusing area of the law, does not change the law, but restates what the law according to the agency is and has always been: 'It is no more retroactive in its operation than is a judicial determination construing and applying a statute to a case in hand.'" *Pope v. Shalala*, 998 F.2d 473, 483 (7th Cir.1993) (quoting *Manhattan General Equip. Co. v. Comm'r*, 297 U.S. 129, 135, 56 S.Ct. 397, 400, 80 L.Ed. 528 (1936)).

Although the retroactive effects of the DOE's interpretive notice do not invalidate the notice, it may be that the timing of the interpretation negates the deference owed the agency's interpretation under *Chevron*. *See Health Insurance Ass'n v. Shalala*, 23 F.3d at 425 (holding that an agency cannot "exploit and claim deference for interpretive rules that did not exist when the transactions were conducted"). This does not change the Court's ruling. As noted above, even without deference to the Secretary's interpretation of the Act, a *de novo* review of the Act leads this Court to the same conclusion—that the most reasonable interpretation of the January 1, 1993 milestone is that a state is required to provide for the disposal of all waste generated within its borders until January 1, 1996, and that partial fulfillment of this condition entitles a state to a partial reward.

Accordingly, the Court *ALLOWS* defendant's motion for summary judgment. Plain-

tiff's cross-motion for summary judgment is *DENIED*. For the same reasons, plaintiff's motion for a preliminary injunction to stay payment of surcharge rebates, Docket No. 28, is also *DENIED*.