VI–CONCRETE COMPANY, APPELLANT, v. STATE OF NEW
JERSEY, DEPARTMENT OF ENVIRONMENTAL
PROTECTION, RESPONDENT.

Argued September 27, 1988—Decided April 19, 1989.

David C. Patterson argued the cause for appellant (*Maressa, Goldstein, Birsner, Patterson & Drinkwater*, attorneys).

A. Colleen Malloy, Deputy Attorney General, argued the cause for respondent (*Cary Edwards*, Attorney General, attorney; *Michael R. Clancy* Deputy Attorney General, of counsel).

Robert A. Marshall submitted a brief on behalf of *amicus curiae* Consolidated Rail Corporation (*Montgomery, McCracken, Walker & Rhoads*, attorneys).

*Timothy S. Haley* and *Stefanie A. Brand* submitted a brief on behalf of *amicus curiae* Township of Voorhees (*Gordon, Gordon & Haley,* attorneys).

The opinion of the Court was delivered by

STEIN, J.

In this case we consider whether the authority conferred on the New Jersey Department of Environmental Protection (DEP) by the Water Pollution Control Act, *N.J.S.A.* 58:10A–1 to –20 (Act or Pollution Control Act), is sufficient to enable DEP to compel the present owners of closed sanitary landfill sites to bear the cost of installing and maintaining monitoring wells on such sites. The wells are intended to monitor the possible discharge of pollutants into the state's waters. The issue arises in the context of a challenge by petitioner, Vi–Concrete, to the validity of a New Jersey Pollutant Discharge Elimination System (NJPDES) permit issued to it unilaterally by DEP. The permit ordered Vi–Concrete to install monitoring wells on its property, which, allegedly unknown to it, had been used as a sanitary landfill until 1968. The Appellate Division upheld the authority of DEP to issue the permit. *Vi–Concrete v. State of New Jersey, Dep't of Envtl. Protection,* 220 *N.J.Super.* 176 (1987).

We have determined that on the record before us it is unnecessary to resolve conclusively the full extent of DEP's authority over closed landfills under the Pollution Control Act. We hold that the Act does not categorically impose on the owners of all closed landfills the duty to install and maintain monitoring wells on their property. We note that the agency has adopted regulations under the Act concerning operating sanitary landfills, *N.J.A.C.* 7:14A–10.12, but has not attempted to promulgate rules applicable to landfills that, as in this case, ceased operations either before or after the Act was adopted. Moreover, we find clear legislative authority to enable DEP for good cause to install and maintain monitoring wells on petition-

er's property, using funds available pursuant to the Sanitary Landfill Closure and Contingency Fund Act, *L.*1981, *c.*306, codified at *N.J.S.A.* 13:1E–100 to –116. Hence, we invalidate the permit issued to petitioner and defer resolution of the question presented until such time as DEP, through rulemaking, has more specifically defined the scope of the power it asserts and the circumstances and conditions under which it is to be exercised.

I.

In 1976 Vi–Concrete purchased a 9.5–acre tract of land in Waterford Township. The property contains an asphalt plant built in 1970. Vi–Concrete uses the plant to make concrete and concrete by-products. The property was used by a prior owner as a sanitary landfill during the 1960s, but has not been used as a landfill since 1968.

In August 1985, the DEP's Division of Water Resources, without any application having been filed, issued a NJPDES permit to Vi–Concrete requiring that four ground-water monitoring wells be installed and maintained on Vi–Concrete's property. The cost of compliance with the permit is estimated to be ten thousand dollars for installation of the wells and three thousand dollars quarterly to perform the required tests.[1]

Vi–Concrete appealed the DEP's issuance of the NJPDES permit, and the matter was referred for hearing to the Office of Administrative Law. Vi–Concrete moved to dismiss summarily the permit issued by DEP, and the agency filed a cross-motion for summary judgment. The Administrative Law Judge (ALJ) denied both motions on the basis that there were factual issues to be resolved. The ALJ upheld DEP's authority to issue a permit without an application, observing that although the

---

[1]At oral argument, counsel for petitioner informed the Court that Vi–Concrete also has been charged a permit fee of approximately fifteen thousand dollars, which is subject to annual increments. *See N.J.A.C.* 7:14A–1.8.

landfill was closed, it is subject to "continued regulation," and petitioner "can under proper circumstances be made to test the water." The ALJ also noted that the regulation relied on by the agency, *N.J.A.C.* 7:14A–10.1, applied only to active landfills. The ALJ concluded that in the absence of proof of specific conditions on the property warranting the installation of monitoring wells, the DEP must act by rulemaking to impose the monitoring requirement generally on all closed landfill sites.

The Commissioner sustained the ALJ's ruling that DEP, without an application, had authority to issue a NJPDES permit to the owner of a closed landfill. However, the Commissioner reversed the ALJ's determination that absent proof of a specific need for monitoring wells, DEP must act by rulemaking before requiring owners of closed landfills to incur the expense of installing and maintaining monitoring wells. The Commissioner determined that the department's actions were specifically mandated by the Pollution Control Act:

> [T]he Water Pollution Control Act authorizes and, in fact, requires the Department to issue NJPDES permits to all classes of landfills regardless of evidence of discharge because it is clearly and directly inferable from the text of the act that all landfills are dischargers and that, in the absence of specific exemptions all landfills require NJPDES permits.

The Appellate Division affirmed the Commissioner's decision. It held that under the Act DEP was authorized to issue a NJPDES permit, without an application, to the present owner of a closed landfill, 220 *N.J.Super.* at 181–82, that all landfills, active or inactive, are "dischargers" within the meaning of the Act, *id.* at 182 and that as the present owner of the property, Vi–Concrete is the proper party to receive the permit, although it may seek contribution or indemnification from its predecessors in title. *Id.* at 183–84. Finally, because Vi–Concrete contended it owned Lot 4, Block 244 in Waterford township and DEP's pleadings referred to the property at issue as Lot 3, Block 244, the matter was remanded to the Commissioner to determine the precise location as well as the present owners of

the landfill in question. *Id.* at 187.[2] We granted certification. 109 *N.J.* 514 (1987).[3]

## II.

Narrowly defined, the question before the Court is one of statutory interpretation, its resolution depending on whether the Commissioner's issuance of this unsolicited permit to Vi–Concrete can be reconciled with the language and objectives of the Pollution Control Act. From a broader perspective, the issue may encompass the power of the DEP to require the installation of monitoring wells at closed landfills throughout the State.[4] We note that the Department did not mandate the installation of monitoring wells as a condition of landfill closure until 1987, *see N.J.A.C.* 7:26–2A.9 (eff. June 1, 1987), to be applicable only to landfills in operation on or after January 1, 1982. *N.J.A.C.* 7:26–2A.9(a).[5]

---

[2]The petition for certification does not challenge the Appellate Division's remand to the Commissioner to determine the location and ownership of the landfill.

[3]The Court also granted the applications of Consolidated Rail Corporation (M–259, 1987) and the Township of Voorhees (M–376, 1987) for leave to appear as *amici curiae* in support of Vi–Concrete's petition for certification. Voorhees asserts that the DEP issued a draft NJPDES permit for a thirty-five acre lot owned by it, which was once the site of a sanitary landfill. The town acquired the property for one dollar, when an elderly resident offered it to the town for use as a park. Voorhees maintains that it has spent nearly $200,000 already on the monitoring equipment and will spend at least another $500,000 to complete and implement a remedial investigation. Conrail represents that it has been issued permits requiring it to install four monitoring wells on property it now owns but did not own when sanitary landfills were in operation on that property. Conrail estimates the cost of installing the monitoring wells to be $40,000 and the cost of testing the wells to be $32,000 annually.

[4]At oral argument the Court was informed that there are approximately 350 closed landfills throughout New Jersey, and that the DEP is generally of the view that monitoring wells should be installed at closed sanitary landfills.

[5]In 1974 DEP adopted a rule prohibiting *new* solid waste facilities from beginning operations

■ We consider first the provisions of the Pollution Control Act, *L.*1977, *c.*74 *N.J.S.A.* 58:10A–1 to –20, and its pertinent regulations. The Act was the Legislature's response to the Federal Water Pollution Control Act Amendments of 1972, 33 *U.S.C.A.* §§ 1251 to 1376, which established an integrated federal system to address the pollution of our nation's water. The federal act made it illegal for anyone to discharge pollutants into the nation's waters without a permit issued pursuant to the National Discharge Elimination System. 33 *U.S.C.A.* §§ 1311, 1342. Each state was given the option to establish its own permit program for discharges, 33 *U.S.C.A.* § 1342(b), and could proceed to do so "upon EPA approval of the state's proposal to administer its own program." *EPA v. State Water Resources Control Bd.,* 426 *U.S.* 200, 208, 96 *S.Ct.* 2022, 2026, 48 *L.Ed.*2d 578, 585 (1976). In adopting the Act the Legislature declared that

pollution of the ground and surface waters of this State continues to endanger public health; to threaten fish and aquatic life, scenic and ecological values; and to limit the domestic, municipal, recreational, industrial, agricultural and other uses of water, even though a significant pollution abatement effort has been made in recent years.

* * * It is in the interest of the people of this State to minimize direct regulation by the Federal Government of wastewater dischargers by enacting legislation which will continue and extend the powers and responsibilities of the Department of Environmental Protection for administering the State's water

without first installing a ground water monitoring system constructed and located in accordance with instructions furnished by the Department. Further, no new facility shall begin operations prior to obtaining ground water samples, and analyses thereof, for the purpose of establishing baseline information. [*N.J.A.C.* 7:26–2.5.22 (repealed by 19 *N.J.Reg.* 928).]
The rule further provided that if

in the opinion of the Department, continued operation of an existing solid waste facility poses a real or potential threat to the quality of the ground waters of the State, the operator of the solid waste facility shall install a ground water monitoring system located and constructed in accordance with instructions furnished by the Department. [*Ibid.*]

Although not a requirement related to landfill closure, this rule appears to have required ground-water monitoring systems to be installed by new landfills and by existing landfills that pose a particular threat to the State's waters.

pollution control program, so that the State may be enabled to implement the permit system required by the Federal Act. ·[*N.J.S.A.* 58:10A–2.]

The Act prohibits the discharge of a pollutant without a federal or NJPDES permit:

It shall be unlawful for any person to discharge any pollutant, except in conformity with a valid New Jersey Pollutant Discharge Elimination System permit that has been issued by the commissioner pursuant to this act or a valid National Pollution Discharge Elimination System permit issued by the administrator pursuant to the Federal Act, as the case may be. [*N.J.S.A.* 58:10A–6a (footnote omitted).]

The Commissioner of the DEP is "authorized to grant, deny, modify, suspend, revoke and reissue NJPDES permits * * *." *N.J.S.A.* 58:10A–6c. Further, the Commissioner has the power, by regulation, to exempt from the permit requirement certain categories of discharge, one of which is discharges from "septic tanks, or other individual waste disposal systems, sanitary landfills, and other means of land disposal of wastes * * *." *N.J.S.A.* 58:10A–6d(3).

The parties acknowledge that the Commissioner has not exercised his power to exempt sanitary landfills from the Act's permit requirements. To the contrary, the regulations under the Act set forth detailed requirements for sanitary-landfill permit applications, *N.J.A.C.* 7:14A–10.12, among which is a specific requirement for the installation of ground-water monitoring wells. *N.J.A.C.* 7:14A–10.12(e)(2)viii. Moreover, regulations adopted pursuant to the Sanitary Landfill Facility Closure and Contingency Fund Act, *N.J.S.A.* 13:1E–100 to –116, specifically require landfills subject to that statute to obtain a permit pursuant to the Pollution Control Act, *N.J.A.C.* 7:26–1.1(a)6(b); *N.J.A.C.* 7:26–2A.4(p). As did the Administrative Law Judge below, however, we read these regulations to apply to operating and not closed landfills. ·

Pursuant to section 6 of the Act, *N.J.S.A.* 58:10A–6, the Commissioner is authorized to impose conditions, compliance schedules, monitoring requirements, and other restrictions in conjunction with the issuance of NJPDES permits, and is authorized to enter any premises on which a discharge source is or

may be located for purposes of inspection or sampling. *See N.J.S.A.* 58:10A–6g. With respect to all applications for discharge permits filed with the DEP, the Act requires the Commissioner to provide public notice to all interested persons and governmental agencies of both the application and the Commissioner's proposed disposition, *N.J.S.A.* 58:10A–9b, and empowers the Commissioner to hold a public hearing before final determination of a permit application. *N.J.S.A.* 58:10A–9d. The Act prescribes civil and criminal penalties for violations, *N.J.S.A.* 58:10A–10d, –10e; it also authorizes the Commissioner to obtain injunctive relief and to recover reimbursement for costs incurred by the State in remedying the effects of any unauthorized discharge. *N.J.S.A.* 58:10A–10c(1), (2), (3).

 In the context of this comprehensive statutory permit system for regulating discharges into the State's waters, petitioner contends that the issuance to it of a NJPDES permit for which it did not apply, solely on the basis that a landfill closed since 1968 formerly was operated on its property, is neither contemplated nor authorized by the Pollution Control Act. Vi–Concrete asserts, first, that it distorts the statutory scheme for DEP to issue it a permit without an application having been filed. The core of its resistance to the DEP's action, however, is its contention that it should not have received a permit because it was not "discharging" any "pollutants" into the state's waters. The State responds that the Commissioner has adopted regulations pursuant to which NJPDES permits may be issued without an application based on information possessed by the Department.[6] On the question whether Vi–Concrete is a discharger under the Act, the State's position is that

---

[6]*N.J.A.C.* 7:14A–2.1(d) provides in part:

The Department shall not issue a permit before receiving a complete application *with the exception* of an emergency permit issued pursuant to N.J.A.C. 7:14A–2.2 or *when the Department issues an interim NJPDES permit based upon information the Department possesses,* which may include applications previously filed with State, Federal or local agencies. (Emphasis added.)

all landfills, active or closed, are "dischargers" for purposes of the Pollution Control Act.

To support its assertion that the Pollution Control Act's permit requirements apply to all landfills, the State relies on *N.J.S.A.* 58:10A–6d, pursuant to which the Commissioner is authorized "by regulation, [to] exempt the following categories of discharge * * * from the requirement of obtaining a permit under this act * * *." The State notes that among the "categories of discharge" eligible for exemption is "(3) Discharges from septic tanks, or other individual waste disposal systems, *sanitary landfills,* and other means of land disposal of wastes * * *." (Emphasis added.) The State reads this statutory language as establishing that *all* landfills are subject to NJPDES permit requirements, absent an exemption from the Commissioner.

The State's alternate argument is that all landfills are dischargers based on the Act's definition of the terms "discharge" and "pollutant." The Act defines "discharge" as the

releasing, spilling, leaking, pumping, pouring, emitting, emptying or dumping of a pollutant into the waters of the State or onto land or into wells from which it might flow or drain into said waters * * *. [*N.J.S.A.* 58:10A–3e.]

A "pollutant" is defined as

dredged spoil, solid waste, incinerator residue, sewage, garbage, refuse, oil, grease, sewage sludge, munitions, chemical wastes, biological materials, radioactive substance, thermal waste, wrecked or discarded equipment, rock, sand, cellar dirt, and industrial, municipal or agricultural waste or other residue discharged into the waters of the State. [*N.J.S.A.* 58:10A–3n.]

The State argues that inasmuch as all landfills, active or inactive, produce a liquid residue that can migrate into the waters of the State, the Water Pollution Act's permit requirements apply to all landfills in the State.

Petitioner relies on *Atlantic City Mun. Utils. Auth. v. Hunt,* 210 *N.J.Super.* 76 (App.Div.1986), a case involving the meaning of "discharge" under the Spill Compensation and Control Act of 1976 (Spill Act), *N.J.S.A.* 58:10–23.11 to –23.11z, to support its contention that the DEP's unverified assumption that all closed landfills necessarily leak pollutants is insufficient to establish a

"discharge" under the Pollution Control Act. In *Hunt*, the Atlantic City Municipal Utilities Authority sought compensation from the Spill Fund to recover cleanup and removal costs incurred by the Authority to prevent contamination of its water supply by chemical waste migrating from Price's Pit, a nearby landfill. Plaintiff alleged that in the early 1970s Price's Pit accepted approximately nine million gallons of chemical waste that were either poured on the ground or buried in drums. The federal Environmental Protection Agency had determined that the contaminants were gradually leaching toward plaintiff's wells.

Both the Law Division and Appellate Division ruled that the Spill Act did not authorize the payment of damages to third parties for losses resulting from discharges that occurred before the Act was passed. Consequently, the Authority contended that the gradual leaching of chemical contaminants from the landfill to the Authority's water sources constituted a present "discharge" of pollutants within the meaning of the Spill Act. The Appellate Division rejected plaintiff's contention, concluding that

> the legislature intended "discharge" to mean a release into the air, water or land of a hazardous or toxic substance. The pouring of hazardous waste on the ground was a discharge. * * * [C]ontinuing contamination from an old spill is not a present discharge. [210 *N.J.Super.* at 96, 98.]

*Cf. State v. Exxon Corp.*, 151 *N.J.Super.* 464, 471 (Ch.Div.1977) (Proof that prior owner of defendant's property saturated ground with petroleum that was leaching into surrounding properties did not establish that defendant was "discharger" within meaning of Water Quality Improvement Act, *N.J.S.A.* 58:10–23.1 to –23.1–10 (repealed by Spill Compensation and Control Act, codified at *N.J.S.A.* 58:10–23.11 to –23.11z).

We need not determine whether these interpretations of the term "discharge" under the Spill Act and its predecessor, the Water Quality Improvement Act, accurately reflect the meaning of discharge under the Pollution Control Act. We acknowledge, however, the State's contention that because the statu-

tory purposes differ, the decisions in *Hunt* and *Exxon* should not be accorded significant weight in this case.

We are unpersuaded by the State's literal reading of the Pollution Control Act that the Legislature intended all closed landfills to be issued NJPDES permits. The Commissioner's unexercised power to exempt sanitary landfills from the permit requirements of the Act, *N.J.S.A.* 58:10A–6d, may mean no more than that operating landfills require permits, an interpretation consistent with the regulations promulgated by the DEP. *N.J.A.C.* 7:14A–10.12. The State's argument that all landfills, active or inactive, leach pollutants that may migrate into the state's waters, and hence are "dischargers," reads too much into the terminology used by the Legislature to establish the Act's permit requirements. The Legislature did not mandate that NJPDES permits be issued to all closed sanitary landfills. We construe the Act to authorize the issuance of a NJPDES permit to the owner of a closed landfill, but only if the DEP has a substantial evidential basis for its belief that the landfill actually is discharging pollutants that might flow or drain into the state's waters. The inference that all closed landfills leach, and therefore are dischargers, is simply insufficient under this statutory scheme to support the DEP's unilateral issuance of a NJPDES permit with its attendant burdens and costs.

 This is plainly a subject on which the agency should proceed by rulemaking in order both to "inform the public and guide the agency in discharging its authorized function." *Lower Main St. Assocs. v. New Jersey Hous. & Mortgage Fin. Agency,* 114 *N.J.* 226, 232; *see Department of Envtl. Protection v. Stavola,* 103 *N.J.* 425, 436–38 (1986); *Department of Labor v. Titan Constr. Co.,* 102 *N.J.* 1, 12–18 (1985); *Crema v. New Jersey Dep't of Envtl. Protection,* 94 *N.J.* 286, 301 (1983). In the course of a rulemaking proceeding, DEP should consider and determine the nature and extent of the discharges from closed landfills that would warrant the agency's resort to the permit procedure, the standards for

determining the imposition and extent of monitoring procedures, and the criteria for determining the appropriate permittee when the agency can identify both the prior operator of the landfill and its present owner. Because the agency did not proceed by rulemaking, and because no proof was offered to demonstrate the presence of an actual discharge of pollutants from the site, we hold that the NJPDES permit issued to Vi–Concrete was not validly authorized.

## III.

■ Our conclusion that the Legislature did not intend the Pollution Control Act's permit provisions to be a mechanism for requiring all closed landfills to install monitoring wells is reinforced by the Sanitary Landfill Facility Closure and Contingency Fund Act (Closure Act), *L*.1981, *c*.306, *N.J.S.A.* 13:1E–100 to –116, and its implementing regulations. The Closure Act imposes on owners or operators of sanitary landfills the responsibility for proper operation and closure, *N.J.S.A.* 13:1E–103, which is defined to include "the costs of the placement of earthen or vegetative cover, the installation of methane gas vents or monitors and leachate monitoring wells or collection systems at the site of any sanitary landfill facility * * *." *N.J.S.A.* 13:1E–102. The Closure Act also establishes the Sanitary Landfill Facility Contingency Fund (Fund), *N.J.S.A.* 13:1E–105. The Fund is administered by DEP and is credited with revenues from a tax imposed on all sanitary landfilll facilities based on the yards of solid waste and gallonage of liquids accepted for disposal. *N.J.S.A.* 13:1E–104. The Fund is made strictly liable "for all direct and indirect damages, no matter by whom sustained, proximately resulting from the operations or closure of any sanitary landfill." *N.J.S.A.* 13:1E–106. Damages for which the Fund is liable include:

> The costs of the design, construction, installation, operation and maintenance of any device or action deemed necessary by the department to clean up, remedy, mitigate, monitor or analyze any threat to the public health, safety or welfare of the citizens of this State, *including the installation and maintenance of* methane gas monitors and vents and *leachate monitoring wells and*

*collection systems*, and the sampling and analysis of any public or private potable water supply. [*N.J.S.A.* 13:1E–106a(4) (emphasis added).]

Any payment of damages by the Fund is to be subject to DEP's acquiring by subrogation the rights of a claimant against the owner or operator of the landfill facility. *N.J.S.A.* 13:1E–111. In accordance with the Closure Act, *N.J.S.A.* 13:1E–114, DEP has adopted regulations effective June 1, 1987, see 19 *N.J.R.* 928(b), governing closure of all sanitary landfills operating on or after January 1, 1982. *N.J.A.C.* 7:26–2A.9(a). The Closure and Post–Closure Care Plan mandated by DEP's regulations must provide, among other detailed requirements, for the design and implementation of:

viii. Groundwater monitoring wells;

ix. A program for the maintenance of groundwater monitoring wells;

x. A program for the monitoring of groundwater in accordance with NJPDES rule, *N.J.A.C.* 7:14A–1, and any permit for that sanitary landfill issued pursuant thereto * * *. [*N.J.A.C.* 7:26–2A.9.]

We read the Closure Act and its implementing regulations as establishing new and comprehensive requirements for the proper closure of sanitary landfills. As noted, the implementing regulations detailing the closure and post-closure standards, including ground-water monitoring wells, were not effective until June 1987, but were made applicable to all landfills operating on or after January 1, 1982. The Closure Act also reflects the Legislature's awareness that landfills closed prior to the effective date of the Closure Act and its implementing regulations "can result in the contamination of surface and ground waters, including potable water supplies," making it "necessary to provide a mechanism for the prompt and adequate compensation for these damages." *N.J.S.A.* 13:1E–101. Thus, the Fund established by the Closure Act is specifically authorized to pay costs resulting from the improper closure of any landfill, including the cost of installing and maintaining monitoring wells. *N.J.S.A.* 13:1E–106. The Fund's revenues are derived from the taxes levied on all operating landfills, reflecting a legislative

purpose to impose on the landfill industry the financial burden of remediating damages caused by improperly closed landfills.

To the extent that DEP determines that monitoring wells are required to be installed and maintained on landfill sites closed prior to January 1982, the Fund established by the Closure Act is clearly authorized to pay the costs of such installation and maintenance.[7] Presumably, the "claimant" for purposes of the Closure Act would be the current property owner, from whom DEP would acquire subrogation rights against the owner or operator of the landfill. *N.J.S.A.* 13:1E–111. We assume that present owners of closed landfill sites would readily consent to DEP's installation and maintenance of leachate monitoring wells on their property if the cost is borne by the Sanitary Landfill Facility Contingency Fund. Alternatively, DEP is empowered in emergent circumstances or for other good cause to install and maintain such monitoring wells without the owner's consent. *See N.J.S.A.* 58:10A–6g (authorizing commissioner to enter premises on which discharge source is or might be located for purposes of inspection and sampling); *N.J.S.A.* 58:10A–10c(2), (3) (authorizing assessment against violator of costs incurred by State for inspection and monitoring, and removing or correcting adverse effects of unauthorized discharge); *N.J.S. A.* 58:10.23–11f (authorizing DEP to remove or arrange for removal of hazardous substances).

Our discussion of the provisions of the Closure Act illuminates the critical issue in this litigation: who should bear the cost of installing and maintaining monitoring facilities at sanitary landfill sites closed before the effective date of the Closure Act? We presume that DEP has ample scientific justification for its conclusion that such monitoring facilities are in the public interest, in that they serve to protect the State's waters

---

[7]The Fund balance of the Sanitary Landfill Facility Contingency Fund was $35,275,151 as of June 30, 1988. Claims totalling approximately $29.6 million had been filed against the Fund as of such date. New Jersey Comprehensive Annual Financial Report at 88–89 (June 30, 1988).

from pollutants. *See generally* English, *Hazardous Waste Regulation: A Prescription for Clean Water*, 13 *Seton Hall L.Rev.* 229, 243–54 (1983) (Evaluating protection from hazardous wastes afforded by water pollution legislation). We do not discern from the provisions of the Pollution Control Act a clear legislative intent to impose that cost categorically on owners of closed landfills on the assumption that all landfills discharge pollutants. In comparison, we are fully satisfied that the Legislature intended that the Sanitary Landfill Facility Contingency Fund, generated by a tax on landfill operations, be available to pay for remediation of improper landfill closure, including specifically the cost of installing and maintaining monitoring wells. Obviously, the Legislature is free to choose a different mechanism for funding the cost of remediating improperly closed landfills. We do not find an intent to do so sufficiently manifested by the provisions of the Pollution Control Act.

## IV.

To summarize, we hold that the Pollution Control Act does not authorize DEP to issue NJPDES permits categorically to owners of closed sanitary landfill sites absent a substantial evidential basis for DEP's belief that the landfill is discharging pollutants into the state's waters. Moreover, DEP must proceed by rulemaking to set forth the standards that govern application of the Act's permit procedures to closed landfills. Accordingly, we hold that the NJPDES permit issued by DEP is invalid, and reverse the judgment of the Appellate Division.

*For reversal*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*For affirmance*—None.