693 A.2d 97

IN THE MATTER OF THE ADOPTION OF N.J.A.C. 7:1I.

TOWNSHIP OF VOORHEES, PETITIONER–RESPONDENT, v. NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, ENVIRONMENTAL CLAIMS ADMINISTRATION, RESPONDENT–APPELLANT.

Argued February 19, 1997—Decided May 15, 1997.

*Eileen P. Kelly*, Deputy Attorney General, argued the cause for appellant (*Peter Verniero*, Attorney General of New Jersey, attorney; *Mary C. Jacobson*, Assistant Attorney General, of counsel)

*Richard M. Hluchan* argued the cause for respondent (*Levin & Hluchan*, attorneys; *Richard S. Morrison*, on the brief).

The opinion of the Court was delivered by

GARIBALDI, J.

This appeal involves the Township of Voorhees's suit to recover environmental remediation expenses under the Sanitary Landfill Facility Closure and Contingency Fund Act (the Closure Act), *N.J.S.A.* 13:1E–100 to –116. The primary issue is whether Voorhees is liable under the Closure Act as an "owner" and, therefore, barred from seeking remediation expenses from that Act's Contingency Fund (the Fund). The Appellate Division held that Voorhees was not an owner within the intendment of the Closure Act

and, therefore, not barred from applying for statutory damages. *Matter of Adoption of N.J.A.C. 711,* 291 *N.J.Super.* 183, 677 *A.*2d 218 (App.Div.1996).

I

During the 1940's, Buzby Brothers Materials Corporation (Buzby) owned and operated a sandmining operation in Voorhees, located on adjacent tracts of land designated as Lot 4 (37 acres) and Lot 33 (19 acres). In March 1959, Buzby initiated a landfilling project on portions of Lot 4 that had been sandmined. The general idea was for the landfilling to follow the sandmining.

In the 1960's and early 1970's, the president of Buzby, Millard Eply, operated a sanitary landfill on Lot 4, which became known as the "Buzby Brothers Landfill." During its years of operation, Voorhees sent waste to the landfill. In 1966, Lot 33 was purchased from Buzby by the RCA Corporation (RCA). A few years later, pursuant to a lease agreement, Buzby continued sandmining and commenced landfilling on Lot 33.

The Department of Environmental Protection (DEP) permitted the Buzby Brothers Landfill to accept municipal, bulky, and non-chemical industrial wastes. Buzby Brothers, however, also accepted hazardous wastes for disposal.

After Millard Eply died in 1969, the operation of the landfill was taken over by Margaret Eply, his wife and an officer of the Buzby corporation. Sometime in 1972, all landfilling operations ceased on Lot 4. Landfilling operations continued, however, on Lot 33, until it reached its capacity in 1978.

In December 1977, Voorhees purchased Lot 4 from Margaret Eply for $1.00 with the expectation of building a public park. At the time of the purchase, the landfill had been closed for at least five years. Although aware that Lot 4 had been used as a sanitary landfill, Voorhees believed, and had no reason to doubt, that the landfilling operation had been properly closed in accordance with existing laws and regulations. Furthermore, Voorhees

had no reason to believe that the lot would experience environmental problems. For several years after the purchase, Lot 4 remained undeveloped and vacant.

In 1982, ten years after the landfill had been closed and five years after Voorhees purchased it, the Legislature passed the Closure Act, *N.J.S.A.* 13:1E–100 to –116, which imposed liability on "owners or operators" of sanitary landfills for costs related to the improper operation or closure of those facilities. The Closure Act also created the Contingency Fund to provide recoupment of remediation expenses by eligible parties. *N.J.S.A.* 13:1E–105.

On October 30, 1986, pursuant to the Water Pollution Control Act, *N.J.S.A.* 58:10A–1 to –20, the DEP unilaterally issued a draft New Jersey Pollutant Discharge Elimination System (NJPDES) permit to Voorhees for Lot 4. The draft permit advised Voorhees that, if the permit were finalized, the Township would be required to install monitoring wells around the perimeter of Lot 4 to evaluate potential discharge of contaminants from the former landfill. Receipt of the draft permit was the first notice Voorhees had that the landfill might have environmental problems. The DEP later issued a final permit, only to rescind it based on our holding in *Vi–Concrete Co. v. New Jersey Department of Environmental Protection,* 115 *N.J.* 1, 3–4, 556 *A.*2d 761 (1989).[1]

Although *Vi–Concrete* was pending, Voorhees entered into an Administrative Consent Order with the DEP and spent several hundred thousand dollars on remedial measures, including the installation and maintenance of appropriate monitoring wells. Thereafter, Voorhees filed a claim with the Sanitary Landfill Contingency Fund seeking recoupment of the money spent on remediation. Voorhees asserted that it suffered damages because the landfill was improperly operated and closed.

---

[1] Voorhees appeared as *amicus curiae* in *Vi–Concrete Co. v. New Jersey Dept. of Envtl. Protection, supra,* 115 *N.J.* at 6, n. 3, 556 *A.*2d 761, in support of Vi–Concrete's petition for certification.

The Environmental Claims Administration (ECA), the part of the DEP responsible for administering the Fund, denied the claim. The ECA reasoned that Voorhees was ineligible to recover damages because the Township was an "owner" of a sanitary landfill, and therefore, was itself jointly and severally liable for closure costs under *N.J.S.A.* 13:1E–103.

In reaching that conclusion, the ECA relied on the fact that *N.J.S.A.* 13:1E–102(b) defines "owner or operator" as "every owner of record of any interest in land whereon a sanitary-landfill facility is or has been located." The ECA also denied Voorhees's request for attorney's fees because such costs did not constitute damages within the meaning of *N.J.S.A.* 13:1E–106(a) and *N.J.A.C.* 7:1I–4.

Voorhees appealed the ECA's ruling to the Office of Administrative Law. The DEP moved for summary disposition, asserting that Voorhees qualified as an "owner" under the plain meaning of the Closure Act. The Administrative Law Judge (ALJ) denied the DEP's motion for summary decision, finding that Voorhees did not fall within the literal meaning of "owner or operator" under the Closure Act. The ALJ stated that, even if the language was debatable, our reasoning in *Vi–Concrete, supra,* excluded purchasers of closed landfills from the definition of "owner."

In 1994, the DEP responded by adopting amended rules for the processing of Contingency Fund claims. Central among those regulations was *N.J.A.C.* 7:1I–1.5, which included a clarification of the definition of "owner" contained in *N.J.S.A.* 13:1E–102(b). Specifically, *N.J.A.C.* 7II–1.5 defined "owner" to include entities owning property "whereon a sanitary landfill is located, has been located, *had been located, or at any time was located." N.J.A.C.* 7:1I–1.5 (emphasis added). Also, *N.J.A.C.* 7:1I–1.5 defined "damages" such that attorneys fees· incurred in filing claims and participating in administrative hearings were not recoverable. 26 *N.J.R.* 1116.

The amended regulations also contained a "Construction and Applicability" section. *See N.J.A.C.* 7:1I–1.2(b). That section

provided that the 1994 regulations "shall apply to the processing of all claims which have not been paid, settled, denied or the subject of a final decision by the Commissioner of the Department on or before February 22, 1994, notwithstanding the date upon which any such claim was filed with the Department." 26 *N.J.R.* 1115. Voorhees appealed the validity of the 1994 regulations, but its request to stay the appeal until the conclusion of the administrative hearing was denied.

Following the adoption of the new regulations, the DEP renewed its motion to the ALJ for summary disposition of Voorhees's claim. The ALJ found the newly adopted regulations applicable to Voorhees and granted the DEP's motion. Voorhees then filed exceptions with the Commissioner who determined that the regulations were created for the "specific reason of clarifying existing law." The Commissioner modified the ALJ's initial decision, stating that "even absent the new regulations Voorhees is an 'owner' under the Closure Act." Voorhees appealed not only from the Commissioner's final decision, but also from the DEP's adoption of the new regulations. The Appellate Division consolidated both matters.

The Appellate Division, relying on *Vi–Concrete, supra,* found that "Voorhees is not an owner within the intendment of the Closure Act." *Matter of Adoption of N.J.A.C. 711,* 291 *N.J.Super.* 183, 187, 677 *A.*2d 218 (App.Div.1996).[2] It further found that this did not resolve the matter because the "statutory language fosters more than one possible meaning." *Id.* at 192, 677 *A.*2d 218. Examining the legislative intent, the panel determined that "the Closure Act reflects a goal to subject to statutory damages those persons or corporations that benefitted from the operation of the sanitary landfill." *Ibid.* Specifically, the Appellate Division concluded that

---

[2] The DEP limited its petition for certification to whether Voorhees was entitled to recover the cost of remediation under the Closure Act. Therefore, the validity of the 1994 regulations is not before the Court.

[t]he legislative objective then was to impose responsibility upon an owner who enabled the improper closure to occur. The legislation, however, does not suggest that any person who acquired title to a closed sanitary landfill prior to the enactment of the Closure Act should be liable for statutory damages.

[*Id.* at 192–93, 677 *A.*2d 218.]

Applying our reasoning in *Vi–Concrete*, the panel concluded that, when the DEP requires a pre-Act purchaser of a closed landfill to install monitoring wells on its property, those costs should be recouped from the Contingency Fund. *Id.* at 193–94, 677 *A.*2d 218. The Appellate Division pointed to our statement in *Vi– Concrete*, that "the 'claimant' for purposes of the Closure Act would be the current property owner, from whom DEP would acquire subrogation rights against the owner or operator of the landfill." *Id.* at 194, 677 *A.*2d 218 (quoting *Vi–Concrete, supra,* 115 *N.J.* at 15, 556 *A.*2d 761). Consequently, the Appellate Division found that Voorhees was not barred from applying for statutory damages. *Id.* at 194, 677 *A.*2d 218.

We granted the DEP's petition for certification. 146 *N.J.* 565, 683 *A.*2d 1161 (1996).

II

As in *Vi–Concrete, supra,* 115 *N.J.* at 6, 556 *A.*2d 761, the question before this Court is one of statutory construction. We must decide whether Voorhees, which purchased a sanitary landfill prior to the enactment of the Closure Act, is entitled to recover remediation costs under that Act.

In 1982, the Legislature passed the Closure Act to supplement the Solid Waste Management Act, *N.J.S.A.* 13:1E–1 to –37. The Legislature emphasized the Act's broad parameters in its legislative findings and declarations:

[T]he proper closure of sanitary landfills is essential to the public health, safety and welfare; that closure activities can require capital expenditures at a time when revenues collected by sanitary landfill facilities are minimal or nonexistent; and that it is necessary to guarantee that adequate funds are reserved to insure such closure.

The Legislature further finds and declares that the improper operation or closure of sanitary landfill facilities can result in the contamination of surface and

ground waters ... that the migration of methane gas from sanitary landfill facilities poses a significant threat to life and property; that compensation for the damage resulting from improper operation or closure is, at best, inadequate; and that it is necessary to provide a mechanism for the prompt and adequate compensation for these damages.

[*N.J.S.A.* 13:1E–101.]

To effectuate those goals, the Legislature created the "Sanitary Landfill Facility Contingency Fund", which is administered by the ECA. In part, *N.J.S.A.* 13:1E–105 states that the Fund was "established as a nonlapsing, revolving fund in the Department of Environmental Protection. . . . [It is] credited with all tax revenues collected by the division pursuant to section 5." *N.J.S.A.* 13:1E–105. Moreover, the Fund is strictly liable for all direct and indirect damages, no matter by whom sustained, proximately resulting from the operations or closure of any sanitary landfill. *N.J.S.A.* 13:1E–106(a).

Because the Fund is liable for such damages, the Closure Act contains mechanisms for generating revenue. The Act provides that "[e]very owner or operator of a sanitary landfill facility shall be jointly and severally liable for the proper operation and closure of the facility, as required by law, and for any damages, no matter by whom sustained, proximately resulting from the operations or closure." *N.J.S.A.* 13:1E–103. Under the Act,

'Owner or operator' means and includes, in addition to the usual meanings thereof, every owner of record of any interest in land whereon a sanitary landfill facility is or has been located, and any person or corporation which owns a majority interest in any other corporation which is the owner or operator of any sanitary landfill facility.

[*N.J.S.A.* 13:1E–102(b).]

That definition is not only important in determining liability to the Fund, but is central in allocating responsibilities under the Closure Act. For example, "owners and operators" are taxed for the amount of waste they accept. *See N.J.S.A.* 13:1E–104(a). "Owners or operators" are also required to deposit money in escrow every month reflecting the tonnage of materials received the preceding month, *see N.J.S.A.* 13:1E–109(a), and may be required to file an annual audit. *See N.J.S.A.* 13:1E–110. Those

tax and escrow provisions apply to sanitary landfill facilities in operation after January 1, 1982 (the effective date of the Closure Act). *Johnson Machinery Co., Inc. v. Manville Sales Corp.,* 248 *N.J.Super.* 285, 300, 590 *A.*2d 1206 (App.Div.1991).

From revenue collected, the Fund provides compensation for "claimants" harmed by the improper operation or closure of landfills, regardless of whether the landfill was in operation before or after the Act's effective date. *Vi–Concrete, supra,* 115 *N.J.* at 13–15, 556 *A.*2d 761. In return for providing this compensation, however, the DEP acquires the claimant's cause of action. *N.J.S.A.* 13:1E–111.

The Closure Act also provides protection for post-enactment purchasers of property that has been used as a landfill. In part, *N.J.S.A.* 13:1E–116 provides:

> No person shall contract to sell any land which has been utilized as a sanitary landfill facility at any time prior to the effective date of [the Closure Act] unless the contract of sale ... shall state the fact and the period of time that the land was so utilized.

> [*N.J.S.A.* 13:1E–116(a).]

A purchaser who does not receive the required notice in the contract of sale has the option of voiding the contract. *N.J.S.A.* 13:1E–116(b).

### III

In order to assess Voorhees's claim for remediation expenses, it must first be determined whether Voorhees is an "owner" of a sanitary landfill as that term is used and defined by the Closure Act. The DEP argues that if Voorhees qualifies as an "owner," it would be unable to recover remediation expenses from the Fund because it would be subject to liability under the Closure Act. *See N.J.A.C.* 7:1I–3.1 (1988); *N.J.A.C.* 7:1I–2.6 (1994); 26 *N.J.R.* 1117.

In construing a statute, the primary task is to " 'effectuate the legislative intent in light of the language used and the objectives sought to be achieved.' " *Merin v. Maglaki,* 126 *N.J.*

430, 435, 599 *A.2d* 1256 (1992) (quoting *State v. Maguire,* 84 *N.J.* 508, 514, 423 *A.2d* 294 (1980)). "[S]tatutes are to be read sensibly rather than literally and the controlling legislative intent is to be presumed as 'consonant to reason and good discretion.' " *Schierstead v. Brigantine,* 29 *N.J.* 220, 230, 148 *A.2d* 591 (1959) (quoting *Morris Canal & Banking Co. v. Central R.R. Co.,* 16 *N.J.Eq.* 419, 428 (Ch. 1863)); *see also Guiseppi v. Walling,* 144 *F.*2d 608, 624 (2d Cir.1944) (Hand, J.) ("There is no surer way to misread any document than to read it literally.").

We agree with the Appellate Division that Voorhees falls within the "literal" meaning of "owner" under *N.J.S.A.* 13:1E–102(b). Nonetheless, we recognize, as did the Appellate Division, that the statute is ambiguous and susceptible to more than one reasonable meaning. Thus, we look to the underlying purposes of the Act in order to decide this case.

The legislative history of the Act and the Act's comprehensive statutory scheme establish that the Legislature intended that the liability associated with improper closure and operation of landfills rest with those parties exercising ownership or control over the site during the landfill's operation and subsequent closure. In essence, the Closure Act is a cost-spreading mechanism designed to impose cleanup costs on the landfill industry. *See generally New Jersey Dept. of Envtl. Protection v. Gloucester Envtl. Mgt. Serv. Inc.,* 800 *F.Supp.* 1210, 1218 (D.N.J.1992) (noting broad policy objectives underlying Act "mandate that those persons who are in a position to know of and control the improper operation and closure of landfills be held liable as 'owners and operators' for statutory violations").

We also find evidence of the Legislature's intent to impose closure liability on the landfill industry in the language of the Act itself. *See, e.g., N.J.S.A.* 13:1E–104 (levying tax on all solid waste accepted for disposal on every owner or operator of landfill); *N.J.S.A.* 13:1E–109 (requiring owner or operator to deposit money in escrow depending on amount of waste accepted per month); *N.J.S.A.* 13:1E–110 (requiring annual audit depending upon vol-

ume of waste received). That intent is further demonstrated by the legislative history of the Act, which states in relevant part:

> This bill ... imposes a levy on the disposal of solid waste, the *revenues* of which are to be deposited in escrow accounts to ensure the proper closure of sanitary landfill facilities; and a *tax on the disposal of solid waste,* the proceeds of which are to be used to establish a Sanitary Landfill Contingency Fund, to be used to pay damages resulting from the improper *operation or closure* of any sanitary landfill.
>
> ... [The bill] (3) mandate[s] that *landfill owners or operators establish escrow accounts for closure costs;* (4) clarif[ies] that the Fund would be available to cover the costs of personal injuries, remedial actions taken by the Department to protect the public health, safety and welfare, and damages resulting from hazardous waste disposed of in sanitary landfills.
>
> [*Assembly Committee Statement to Assembly No.1935,* April 27, 1981 (emphasis added).]

Furthermore, after signing the bill into law, Governor Byrne stated:

> The bill ... establishes the Sanitary Landfill Facility Contingency Fund Tax on the owners and operators of sanitary landfills.... The bill will also require the operators of landfills to make a monthly deposit in an escrow account to cover their costs of closure.... The escrow account, payed over the life of the landfill, will ensure substantial funds to cover closure costs of those facilities. Owners and operators of landfills will be allowed to raise the rates they charge for solid waste collection, but the increased costs to consumers are expected to be minimal.
>
> [*Press Release from the Office of the Governor,* November 30, 1981.]

This interpretation is consistent with our findings in *Vi–Concrete, supra.* In *Vi–Concrete,* we were presented with the issue of whether the Commissioner could issue an unsolicited NJPDES permit to a closed landfill under the Water Pollution Control Act. 115 *N.J.* at 6, 556 *A.*2d 761. The broader issue was whether the DEP could require the installation of monitoring wells at closed landfills. *Ibid.*

Addressing the propriety of the NJPDES permit, we held that, absent a "substantial evidential basis for believing the landfill was discharging pollutants into state's waters," the DEP could not unilaterally issue such a permit. *Id.* at 12, 556 *A.*2d 761. As such, the NJPDES permit issued to Vi–Concrete was invalid. *Id.* at 13, 556 *A.*2d 761. Although the case focused on the Water Pollution Act, *see N.J.S.A.* 58:10A–1 to –20, the Court looked at the Closure Act to buttress its conclusion.

In so holding, we recognized that the Closure Act highlighted the "critical" issue in that case: "who should bear the cost of installing and maintaining monitoring facilities at sanitary landfill sites closed before the effective date of the Closure Act?" *Id.* at 15, 556 *A.*2d 761. In our analysis, we stated that the Act was intended to generate revenue to pay the costs associated with the improper closure of any sanitary landfill. *Id.* at 14, 556 *A.*2d 761. Furthermore, we noted that the Contingency Fund's revenues were "derived from the taxes levied on all operating landfills, *reflecting a legislative purpose to impose on the landfill industry the financial burden of remediating damages caused by improperly closed landfills.*" *Id.* at 14–15, 556 *A.*2d 761 (emphasis added).

Accordingly, we found that the Legislature intended the Fund to be available to "pay for remediation of improper landfill closure, including specifically the cost of installing and maintaining monitoring wells." *Id.* at 16, 556 *A.*2d 761. In such cases, the "current property owner" would be the "claimant" under the Fund and the DEP would obtain a claim against the owner or operator of the landfill. *Id.* at 15, 556 *A.*2d 761. Therefore, the dissent's assertion, that the Buzbys would escape liability to clean this landfill displays a total misunderstanding of that well-established principle. *Post* at 134, 693 *A.*2d at 105.

> To the extent that [the] DEP determined that monitoring wells are required to be installed and maintained on landfill sites closed prior to January 1982, the Fund established by the Closure Act is clearly authorized to pay the costs of such installation and maintenance. *Presumably, the "claimant" for purposes of the Closure Act would be the current property owner, from whom [the] DEP would acquire subrogation rights against the owner or operator of the landfill.* We assume that present owners of closed landfill sites would readily consent to [the] DEP's installation and maintenance of leachate monitoring wells on their property if the cost is borne by the Sanitary Land Fill Facility Contingency Fund.
> [*Id.* at 14–15, 556 *A.*2d 761 (citations omitted) (emphasis added).]

A further consideration supporting that interpretation is the desire to encourage owners to take prompt and appropriate actions to remedy environmental problems that threaten the public welfare. *See N.J.S.A.* 13:1E–101. If current landowners know

that remediation expenses can be recovered from the Fund, they will more likely consent to the DEP's request for remedial measures.

Construing the Act in that fashion also vindicates the public interest, because current owners of former landfill sites will be empowered to expeditiously remediate environmental hazards that threaten public health, safety, and welfare. Enabling pre-Act purchasers of closed landfills to receive compensation from the Contingency Fund fosters another primary purpose of the Act, the provision of prompt and adequate compensation to persons injured by the improper closure or operation of a sanitary landfill. *N.J.S.A.* 13:1E–101.

Because this case turns on whether Voorhees benefitted from the use of the property as a sanitary landfill and was responsible for closure activities, the fact that Voorhees knew that the site was previously utilized as a landfill and actually sent waste to the facility is of no import. Voorhees never owned or operated the landfill and never took part in any closure activities. Therefore, it is not liable for cleanup costs and is entitled to reimbursement for such costs from the Contingency Fund.

## IV

We find little merit in the DEP's concern that our holding will cause real-estate buyers to speculate on closed landfills. Voorhees is not speculating in real estate. This property was purchased to be used as a public park. Furthermore, we do not think that a market for closed landfills will develop, particularly in view of *N.J.S.A.* 13:1E–116. Under that provision, a post-Act purchaser who did not receive notice that there was a former landfill on the property may void the contract of sale at his or her discretion. The purpose of that provision is to ensure that purchasers knowingly assume responsibility for potential liability. *Ibid.* (citing *Johnson Machinery, supra,* 248 *N.J.Super.* at 305, 590 *A.*2d 1206). In that case, the Appellate Division observed that such notice is critical because it informs the buyer that he or she is subject to

the Closure Act. Thus, a person receiving notice cannot make a claim against the Fund.

■ The notice provision ensures that our decision will not cause a substantial drain on the Fund. Recovery under the fund for present owners of a closed landfill is very limited. Only those present owners of closed landfill sites who (1) purchased the land after the landfill facility was closed; (2) purchased prior to passage of the Closure Act; and (3) took no part in the landfill facility's operations will be entitled to recoup the costs of remediation from the Fund.[3]

Nor do we agree with the DEP's attempt to draw an analogy between the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 *U.S.C.A.* §§ 9601 to –9657, and the Closure Act to establish Voorhees' liability. First, CERCLA is not applicable to this case. Second, nothing in the legislative history of the Closure Act indicates that the Legislature considered CERCLA when it enacted that Act. Therefore, CERCLA has no bearing on Voorhees's liability under the Closure Act.

V

The Closure Act provides a mechanism for compensating parties who are injured by the operation or improper closure of landfills. To generate revenue for the Fund, the Act both taxes and imposes liability on owners and operators of sanitary landfills. The Legislature imposed the burden of remediation costs on the landfill

---

[3] To encourage understandably reluctant developers to purchase and to develop urban landfills, the Legislature on November 6, 1996, adopted the "Municipal Landfill Site Closure, Remediation and Development Act" (the Redevelopment Act *L.* 1996, *c.* 124), that allows an eligible developer to recover 75% of the costs of remediation and closure of a landfill located in an urban area that had ceased operations prior to the enactment of the Closure Act. Due to the aforementioned limitations placed on owners recovering under the Closure Act, without the Redevelopment Act such owner-developers could not recover from the Fund. The Redevelopment Act offers further support that the DEP's fears that our decision will spark real estate speculation in closed landfills are unfounded.

industry. Voorhees never benefitted from the operation of the landfill, which was closed years before Voorhees purchased the site. When Voorhees obtained the property, it had no reason to believe that it had not been closed in accordance with appropriate laws.

The judgment of the Appellate Division is affirmed.

O'HERN, J., dissenting.

This case is an illustration of Murphy's Law of unintended consequences.[1] A fund created to compensate the innocent victims of past unsafe landfill practices has been transformed into a windfall for dump owners.

In 1977, Voorhees Township purchased the Buzby Brothers Landfill for $1.00. The previous owners, the Buzbys and others, had discharged solid waste at this facility and, pursuant to *N.J.S.A.* 58:10–23.11 to –23.24 (the Spill Act), Voorhees is or may be jointly or severally liable to clean up the site. The Buzby Landfill is a notorious site that has housed large amounts of environmentally hazardous wastes for over thirty years. The Landfill consists of two tracts of property amounting to about fifty-six acres. *Strawn v. Canuso*, 140 *N.J.* 43, 49, 657 *A.*2d 420 (1995).

In 1986, the New Jersey Department of Environmental Protection (DEP) directed Voorhees to install monitoring wells at the site. Voorhees eventually agreed to undertake remedial measures necessitated by the existence of the landfill on the property. Voorhees seeks to recover from the Sanitary Landfill Contingency Fund approximately $1 million in damages for the costs incurred. DEP denied Voorhees' claim on the basis that Voorhees was an owner of the landfill and thus was itself liable for the closure costs pursuant to *N.J.S.A.* 13:1E–103. The Court has seemingly turned the statute on its head and, instead of imposing liability for closure

---

[1] "Murphy's Law" states that if there is a possibility for something to go wrong, it will go wrong. *Sanders v. Weaver*, 583 *So.*2d 1326, 1327 (Ala.1991).

costs on the owners of landfills, has rewarded them by cleaning up and restoring their dumpsites at the expense of the taxpayers.

The Sanitary Landfill Facility Closure and Contingency Fund Act (Closure Act), *L.* 1981, *c.* 306, *N.J.S.A.* 13:1E–100 to –116, imposes on owners or operators of sanitary landfills responsibility for the proper closure of landfills. The Closure Act requires each landfill owner or operator to establish an escrow account for the closure of the landfill. *N.J.S.A.* 13:1E–109. It defines closure costs to include "the costs of the placement of earthen or vegetative cover, the installation of methane gas vents or monitors and leachate monitoring wells or collection systems at the site of any sanitary landfill facility . . . ." *N.J.S.A.* 13:1E–102a.

The Closure Act also established the Sanitary Landfill Facility Contingency Fund (Fund), *N.J.S.A.* 13:1E–105. DEP administers the Fund, which is run with the tax revenues (a tipping tax) collected from all sanitary landfill facilities, based on the amount of waste accepted for disposal. *N.J.S.A.* 13:1E–104. The Fund is made strictly liable for "all direct and indirect damages, no matter by whom sustained, proximately resulting from the operations or closure of any sanitary landfill." *N.J.S.A.* 13:1E–106a. The characteristic beneficiaries to be compensated are those living in the neighborhood of the landfill who have suffered damages, such as diminution of property values, from the presence of the landfill. *Citizens for Equity v. New Jersey Dep't of Envtl. Protection,* 126 *N.J.* 391, 394, 599 *A.*2d 507 (1991).

It stands to reason that the Legislature would not in one breath impose upon the owners of landfills the duty to clean up and in the next breath give them the money to do the cleanup. If instead of selling the landfill to Voorhees for $1.00, the Buzbys had given or devised the property to Voorhees—would Voorhees be able to have the State (through its taxpayers) clean up the site? If the answer is yes, as the majority asserts, could the Buzbys have given the property to family or friends and enabled them to receive a State-funded cleanup? The answer to me is obviously no. Yet the majority's logic would go so far.

DEP argues that the recent adoption of the "Municipal Landfill Site Closure, Remediation and Redevelopment Act" (the Redevelopment Act), *L.* 1996, *c.* 124, *N.J.S.A.* 13:1E–116.1 to –116.7, supports its interpretation of the Legislature's intent. The Redevelopment Act authorizes DEP to enter a redevelopment agreement covering municipal landfills closed prior to January 1, 1982 and makes the developer eligible to recover 75% of the costs of remediation and closure of the landfill from a new fund. The Act sets forth a number of factors related to the benefits of redevelopment, including a potential for job creation, economic development, the degree of economic and related social distress in the area to be redeveloped, and the likelihood that the project will generate enough sales tax income to repay the Redevelopment Fund for the costs of closure. *N.J.S.A.* 13:1E–116.3. The Attorney General argues that "the Legislature would not have needed to create a new source of reimbursement if the total reimbursement of subsequent purchasers was already provided by [the Fund]." This is not a complete answer because the Court's opinion is limited to that class of purchasers who acquired landfills before the 1982 Closure Act. However, several other new initiatives providing mechanisms for recouping cleanup costs would also be unnecessary in the case of pre–1982 acquisitions under the majority's theory. *See* Stuart J. Lieberman, *Buying, selling contaminated sites,* 6 *N.J.L.* 1055 (Apr. 28, 1997) (outlining federal and state initiatives).

Any further doubt about DEP's interpretation of the legislative intent evaporates under the facts of this case. As the Appellate Division noted, Voorhees deposited its municipal waste at the landfill for many years prior to the site's closure and Voorhees' subsequent purchase. 291 *N.J.Super.* 183, 187, 677 *A.*2d 218 (App.Div.1996). Voorhees is thus subject as a purchaser to strict liability for cleanup under the Spill Act unless it can show it "did not know and had no reason to know that any hazardous substance had been discharged" at the landfill. *See N.J.S.A.* 58:10–23.11(d)(b)(i). Voorhees may also be subject to liability under the Spill Act as a generator of the hazardous waste accumulated at the site.

We are informed that to affirm the Appellate Division decision will seriously undermine the ability of DEP to administer the Fund. Voorhees was on notice that the property that it purchased would be a source of pollution. DEP has previously interpreted the language of *N.J.S.A.* 13:1E–103 to allow claims by an innocent purchaser when the person failed to discover the existence of the landfill despite making a reasonable inquiry. *See N.J.A.C.* 7:1I–2.6(d)(1) (allowing claimants to recover if, after exercising reasonable diligence, they still had not discovered presence of landfill at time of purchase).

The Closure Act could not be more explicit in its application to closed landfills. It defines "owner or operator" as "every owner of record of any interest in land whereon a sanitary landfill facility is or has been located." *N.J.S.A.* 13:1E–102b. The Court has reinterpreted the statute in order to achieve what it believes to be a preferable result. Similar arguments have been made with respect to the federal Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 *U.S.C.* §§ 9601 to 9675 (1997), which was enacted in response to evidence of improper hazardous waste disposal and was designed to effect the speedy cleanup of hazardous waste sites. *Transtech Indus. v. A & Z Septic Clean,* 798 *F.Supp.* 1079, 1082 (D.N.J.1992), *appeal dismissed,* 5 *F.*3d 51 (3d Cir.1993), *cert. denied,* 512 *U.S.* 1213, 114 *S.Ct.* 2692, 129 *L.Ed.*2d 823 (1994). CERCLA imposes strict liability upon those parties falling within its terms. *United States v. Kramer,* 757 *F.Supp.* 397, 419 (D.N.J.1991). Courts have held that the purchaser of contaminated property is responsible under the Act even though the contamination did not occur during the period of ownership. *See, e.g., New York v. Shore Realty Corp.,* 759 *F.*2d 1032, 1044 (2d Cir.1985). Voorhees is therefore strictly liable under CERCLA.[2] All that the Court's decision accomplishes is to force a circularity of actions. DEP will be required to pursue Voorhees under our Spill Act and perhaps under CERCLA

---

[2] If the Legislature does not sooner amend the Act, Voorhees may return to the Fund to recover cleanup costs imposed on it under CERCLA.

to obtain reimbursement of the same funds distributed from the Fund.[3] In the alternative, DEP may be entitled to a set-off for its Spill Act claim in the Closure Act proceedings. This circuitous approach is a waste of judicial and administrative time and resources. Voorhees is already involved in a federal lawsuit related to the Buzby Landfill. *See Township of Haddon v. Royal Ins. Co. of America,* 929 *F.Supp.* 774, 776 (D.N.J.1996).

The Court's reliance on *Vi-Concrete Company v. New Jersey Department of Environmental Protection,* 115 *N.J.* 1, 556 *A.*2d 761 (1989), is misplaced. What the Court actually held in *Vi-Concrete* was that DEP did have authority to issue pollutant discharge elimination permits when there was "a substantial evidential basis for DEP's belief that the landfill is discharging pollutants into the State's waters. Moreover, DEP must proceed by rulemaking to set forth the standards that govern application of the [Water Pollution Control Act's] permit procedures to closed landfills." 115 *N.J.* at 16, 556 *A.*2d 761. In essence, the Court said that if DEP proceeded by rulemaking and had a basis for believing that a landfill was discharging pollutants, the owner could be required to take the remedial measures required by law. All that the Court decided in *Vi-Concrete* was that DEP had to have regulations in place before it could categorically issue water pollution permits to the innocent acquirers of sanitary landfills.

I would reverse the judgment of the Appellate Division and deny Voorhees' claim.

Justice POLLOCK joins in this opinion.

*For affirmance*—Chief Justice PORITZ, and Justices GARIBALDI, STEIN and COLEMAN—4.

*For reversal*—Justices O'HERN and POLLOCK—2.

---

[3] The Spill Act is the State analog to CERCLA; it also imposes strict liability. *SC Holdings, Inc. v. A.A.A. Realty Co.,* 935 *F.Supp.* 1354, 1365 (D.N.J.1996).