**The CENTRAL MIDWEST INTERSTATE LOW–LEVEL RADIOACTIVE WASTE COMMISSION, Plaintiff–Appellant,**

v.

**The Honorable Federico PENA,[1] in his official capacity as Secretary of Energy, Defendant–Appellee.**

and

**COMMONWEALTH EDISON COMPANY and Illinois Power Company, Plaintiff/Intervenors–Appellees,**

v.

**The Honorable Federico PENA, in his official capacity as Secretary of Energy, Defendant–Appellee.**

No. 96–3674.

United States Court of Appeals, Seventh Circuit.

Argued April 4, 1997.

Decided May 20, 1997.

---

**1.** Federico Pena, pursuant to Fed.R.App.P. 43(c), has been substituted as a party because he became the Secretary of Energy during the pendency of this appeal.

Eric M. Schwing (argued), Babette P. Salus, Schwing & Salus, Springfield, IL, for Central Midwest Interstate Low–Level Radioactive Waste Commission.

James E. Peckert, Kehart, Shafter, Hughes & Webber, Decatur, IL, for Illinois Power Company.

Mark Stern, Michael S. Raab (argued), Department of Justice, Civil Division, Appellate Section, Washington, DC, James A. Lewis, Office of the United States Attorney, Springfield, IL, for Hazel O'Leary.

Julie A. Bauer (argued), Robert L. Michels, Percy Lee Berger, Jr., Winston & Strawn, Chicago, IL, for Commonwealth Edison Company.

Before CUMMINGS, DIANE P. WOOD, and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

Under the Low–Level Radioactive Waste Policy Amendments Act of 1985, 42 U.S.C. § 2021b *et seq.*, states or interstate compacts which were able to "provide for" the disposal of all low-level radioactive waste generated within their borders from January 1, 1993, to January 1, 1996, were entitled to certain monthly incentive payments. The payments were made from an escrow account funded by surcharges imposed on waste generators and held in trust by the Secretary of Energy. 42 U.S.C. § 2021e(d)(2)(A). If a state or compact was unable to provide for full disposal for any part of the 3–year period, the corresponding monthly payments were refunded to the generators. § 2021e(d)(2)(C)(ii). The Central Midwest Interstate Waste Commission, which over-

sees a compact signed by Illinois and Kentucky, claimed it met the "provide for" requirement and was entitled to the incentive payments because it allowed generators to ship their waste out of the region. The Secretary of Energy disagreed, finding that the phrase "provide for" required the Commission to do more than simply permit generators to export their waste. Unhappy with that decision, the Commission sued the Secretary in district court. Illinois Power and Commonwealth Edison, two waste generators who had been receiving refunds, intervened and sided with the Secretary. The district court granted summary judgment for the Secretary, Illinois Power, and Com–Ed, and this appeal followed.

Millions of cubic feet of low-level radioactive waste are generated by power companies, industry, the government, universities, and hospitals each year. *See New York v. United States*, 505 U.S. 144, 149–50, 112 S.Ct. 2408, 2414, 120 L.Ed.2d 120 (1992). The main problem with this type of waste, which comes in forms ranging from luminous watch dials to nuclear power plant hardware, is that it often needs to remain isolated for hundreds of years before it no longer poses any health risk.

In the late 1970's, as some of the dangers associated with the disposal of the waste came to light, half of the nation's disposal facilities closed their doors. By late 1978 only three sites-those in Washington, Nevada, and South Carolina-remained open. Then, in 1979, following a series of transportation and packaging mishaps, Washington and Nevada temporarily shut down their facilities. Less than eager to serve as the nation's dumping ground for radioactive waste, South Carolina severely cut back on the amount of waste it was willing to accept at its site. A crisis was at hand.

In 1980 Congress reacted to the crisis by enacting the Low–Level Radioactive Waste Policy Act, Pub.L. 96–573, 94 Stat. 3347. The 1980 Act announced a federal policy of holding each state responsible for "providing for the availability of capacity ... for the disposal of low-level radioactive waste generated within its borders." Because Congress concluded that disposal could be managed most efficiently at a regional level, the 1980 Act encouraged states to form interstate compacts. Starting in 1986, these compacts, after being ratified by Congress to take the dormant Commerce Clause out of the picture, could prohibit outside waste from entering their regions' disposal facilities.

The 1980 Act was largely a flop. By 1985, although most states had joined compacts, only the three formed around Washington, Nevada, and South Carolina—the states with facilities in operation before the Act was passed—had disposal sites. Congress realized that if it ratified the compacts as planned, the three sited compacts could have started excluding outside waste in 1986, and as many as 31 states would have been left without access to a disposal facility.

To head off a second disposal crisis, Congress passed the Low–Level Radioactive Waste Policy Amendments Act of 1985. The 1985 Act was largely the product of a compromise worked out by the nation's governors, and part of the legislation took a familiar tack. For example, like its predecessor, the 1985 Act declared that "[e]ach State shall be responsible for providing, either by itself or in cooperation with other States, for the disposal of ... low-level radioactive waste generated within the State." § 2021c(a)(1)(A). Similarly, the 1985 Act made clear that Congress thought regional compacts would be the safest and most efficient way to increase disposal capacity and ensure uniform distribution of disposal sites. *See* § 2021d(a).

However, part of the legislation took an aggressive approach absent in the 1980 Act. Under the new act, the three sited states were required to accept low-level radioactive waste generated outside of their borders until 1992. § 2021e(a)(2). In exchange, the sited states were allowed to assess graduated surcharges on outside waste. § 2021e(d)(1). Then, when the 7 years were up, the sited states would be allowed to exclude out-of-state waste. In order to encourage unsited states to meet their responsibility for disposing of their own waste by 1992, the 1985 Act set forth three different types of incentives-monetary, access, and a take-title requirement. *See New York*, 505 U.S. 144, 112 S.Ct. 2408 (describing the incentives and striking

down a provision requiring noncomplying states to take title to all waste generated within their borders).

This case deals with one of the monetary incentives. Under the 1985 Act, the sited states were required to forward 25 percent of the surcharges they collected from outside generators to an escrow account held in trust by the Secretary of Energy. § 2021e(d)(2)(A). The Secretary was then to use the funds to make incentive payments to states meeting four statutory "milestones." These milestones followed a "natural progression" toward the development of regional disposal facilities. *Appalachian States Low-Level Radioactive Waste Comm'n v. O'Leary,* 93 F.3d 103, 106 (3d Cir.1996). First, by July 1986, each state electing to work with its neighbors needed to ratify a regional compact. Second, by January 1988, each unsited compact was to have designated a host state for a regional disposal facility. Third, by January 1990, each compact needed to either apply for a disposal license or certify that the compact would be able to dispose of its region's waste by 1992. *See* § 2021e(d)(2)(B)(i)–(iii), 2021e(e)(1)(A), (C).

That brings us to the fourth milestone—the one at issue in this case. Under that provision the Secretary was to disburse the remaining escrow funds to compacts which, by January 1, 1993, were "able to provide for the disposal of all low-level radioactive waste generated" within their borders. § 2021e(d)(2)(B)(iv). If a compact was unable to provide for full disposal it could either take title to the region's waste or forfeit the incentive payments back to the generators who originally paid them. § 2021e(d)(2)(C)(ii). Finally, if an initially noncomplying compact became able to provide for full disposal of its waste during any part of the 36–month period between January 1, 1993, and January 1, 1996, it was entitled to a pro rata share of the remaining surcharges. § 2021e(d)(2)(C).

In September 1992 the Secretary published a notice in the *Federal Register* proposing criteria for determining whether a compact had demonstrated compliance with the fourth milestone. *See* 57 Fed.Reg. 45248 (1992). The Secretary suggested that a compact could provide for disposal by either operating

a disposal facility or pointing to a valid contract with another state or compact for disposal of the region's waste. *Id.* The notice also invited interested parties to comment on the criteria. Many of the parties commenting on the Secretary's proposed interpretation explained that a number of compacts had entered into identical 18–month contracts with the Southeast Compact, which had guaranteed access to its disposal facility in Barnwell, South Carolina, from January 1, 1993, through June 30, 1994.

One of the regional entities inking a Barnwell contract was the Central Midwest Low-Level Radioactive Waste Commission. The Commission was set up to administer a compact worked out between Illinois and Kentucky. Among other things, the compact designated Illinois as the host state for a future disposal site and imposed both criminal and civil penalties on generators who shipped their LLRW out of the region. However, because the policy prohibiting generators from exporting waste was designed to ensure that a regional disposal site, once built, would be guaranteed enough waste to operate profitably, the Commission's September 1988 Regional Management Plan lifted the export ban until a regional facility came on line.

Four years later, in November 1992, with its Barnwell contract in hand, the Commission sued the Secretary of Energy, arguing that it had complied with the fourth milestone and was entitled to all of the funds (about $3.5 million) remaining in the escrow account. *Central Midwest Interstate Low-Level Radioactive Waste Comm'n v. O'Leary,* 858 F.Supp. 114 (C.D.Ill.1994) (*Central Midwest I*). Illinois Power and Commonwealth Edison, the two largest generators in the Central Midwest region, intervened. They asserted because the goal of the statute was to increase disposal capacity and the Commission had merely sent its waste to an existing site, the Commission was not entitled to any incentive payments.

In March 1994, while the Commission's suit was pending, the Secretary published

her [2] final policies on the fourth milestone. *See* 59 Fed.Reg. 15189–96 (1994). She concluded the standard 18–month Barnwell contracts entitled compact regions to one-half of the total incentive payments available under the fourth milestone. She reasoned partial payment was due because the contracts only covered one half of the 36–month monitoring period (January 1, 1993, to January 1, 1996) set out in § 2021e(d)(2)(C). *Id.* at 15191–92.

In June 1994 the district judge accepted the Secretary's interpretation of the milestone and held that the Commission's Barnwell contract was enough to "provide for" disposal. However, following the Secretary's lead, he found because the contract only covered 18 months of the 3–year monitoring period the Commission was only entitled to half of the funds remaining in escrow. *Central Midwest I,* 858 F.Supp. at 119. As a result, he ordered the Secretary to pay the Commission a prorated lump sum totaling $1,714,725. None of the parties to the suit appealed.

The Commission's Barnwell contract expired on June 30, 1994, and the Southeast Compact refused to accept waste generated outside of the region the next day. Because the Commission did not work out a new deal and the Central Midwest generators did not have anywhere to ship all of their waste, the Secretary determined that the Commission was no longer complying with the fourth milestone. As a result she started refunding the surcharges to the generators on a monthly basis.

Exactly one year later, on July 1, 1995, South Carolina withdrew from the Southeast Compact and reopened Barnwell to outside waste. Despite the withdrawal the Commission did not work out a new contract with South Carolina. Instead it left the generators, who had been forced to store much of their waste for 12 months,[3] to negotiate their own access.

On August 2, 1995, the Commission sent a letter to the Secretary demanding incentive payments from "July 1, 1995, onward." The Commission claimed it was entitled to the cash because it had provided for disposal by allowing generators to ship their waste to the newly reopened Barnwell site. Two days later the Commission dashed off another letter, claiming additional entitlement to payments—which had already been refunded to the generators—for the period from July 1, 1994, to June 30, 1995. The Commission suggested that although Barnwell was closed during that period, the generators could now send any stored waste to the reopened facility. The Secretary denied the requests, concluding that merely allowing generators to export waste did not "provide for" disposal.

Immediately after learning of the denial the Commission once again sued the Secretary in district court, claiming it was entitled to the 6 months worth of funds remaining in the escrow account plus a lump sum payment "equal to 12/36 (one-third) of the original trust funds, plus interest." That is, the Commission repeated its demand for not only the remaining incentives but also the money returned to the generators during the 12 months in which they were forced to store their waste. Illinois Power and Com–Ed once again intervened, again siding with the Secretary.

On cross-motions for summary judgment, the district court upheld the Secretary's decision to deny the Commission's request and continue refunding the surcharges. The court found that the phrase "provide for" was ambiguous and the Secretary's interpretation—that "provide for" meant something more than "permit"—was permissible. Finally, the court noted that it failed to grasp "why the Commission should be rewarded for basically doing nothing" except leaving "the waste generators and citizens of Illinois and Kentucky ... in the same precarious position" as they were in before Congress passed the 1980 Act. The Commission then filed this appeal.

We review the district court's decision to grant summary judgment *de novo. Lewis v. Richards,* 107 F.3d 549, 552 (7th Cir.1997).

---

**2.** At the time, the Secretary of Energy was Hazel O'Leary.

**3.** The generators were able to send some of their waste to a facility in Utah during this period. However, that facility did not accept all types of low-level radioactive waste.

The Commission believes the district court missed the boat when it accepted the Secretary's interpretation of the fourth milestone. In response, the Secretary, Illinois Power, and Com–Ed contend the district court correctly decided the case on the merits and, in any event, that *res judicata* bars this lawsuit. Because we find the Commission's claim to the incentive payments lacks merit, we need not determine whether *res judicata* applies.

■ The Commission first argues that the district court erred in affording any deference to the Secretary's interpretation. The Commission claims no deference was due because the Secretary does not have rulemaking authority, acted inconsistently, and violated her own rules. The Commission, it appears, is correct in one sense. Under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, an interpretation of an ambiguous statute by an agency authorized to promulgate rules will be upheld as long as it is reasonable. 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Because the Secretary does not possess rulemaking authority, however, her take on the fourth milestone is—as the district court noted-an "interpretive rule." *Accord Appalachian States*, 93 F.3d at 112–13; *Massachusetts ex rel. Low–Level Radioactive Waste Management Bd. v. O'Leary*, 925 F.Supp. 857, 861 n. 4 (D.Mass.1996). Unlike some circuits, we do not apply *Chevron*'s "rubber stamp" to interpretive rules. *Atchison, Topeka and Santa Fe Ry. v. Pena*, 44 F.3d 437, 442 (7th Cir.1994) (*en banc*), *aff'd. sub nom. Brotherhood of Locomotive Engineers v. Atchison, Topeka and Santa Fe Ry.*, —— U.S. ——, 116 S.Ct. 595, 133 L.Ed.2d 535 (1996); *but see Appalachian States*, 93 F.3d 103 (applying *Chevron* to the Secretary's interpretation of the fourth milestone). Rather, the degree of deference we give to an interpretive rule depends on the "thoroughness, validity, and consistency of the agency's reasoning." *Atchison*, 44 F.3d at 442 (quoting *Orrego v. 833 West Buena Joint Venture*, 943 F.2d 730, 736 (7th Cir. 1991)).

■ The circumstances surrounding the Secretary's interpretation of the fourth milestone convince us that some deference is due.

Section 2021e(d)(2) requires the Secretary to act as trustee and disburse escrow funds in accordance with the Act. In order to carry out that mandate she needed to develop criteria for determining whether a state or compact had provided for the disposal of its waste. And although the Secretary did not jump through *all* of the procedural hoops necessary to promulgate a full-fledged "rule" (interpretive rules are exempt from the notice and comment provisions of the Administrative Procedure Act), she published a notice on the topic in 1992, solicited written comments, considered the issue for 18 months, and released a final policy statement in March 1994. That seems, to us, like a thorough and "deliberate attempt to implement the will of Congress through the regulatory process." *Id.* (quoting *Pennington v. Didrickson*, 22 F.3d 1376, 1383 (7th Cir.), *cert. denied*, 513 U.S. 1032, 115 S.Ct. 613, 130 L.Ed.2d 522 (1994)).

However, even if *de novo* review were appropriate, the Commission's argument would fail. The fourth milestone states that the Commission must "provide for" the disposal of the region's waste before it is rewarded with an incentive payment. The Commission asserts that it provided for disposal because "but for" its 1988 decision to lift the compact's export ban, the generators would not have been able to ship one speck of low-level radioactive waste to Barnwell. In an attempt to bolster its claim that it could "provide for" disposal by allowing a third party to act, the Commission notes that in *New York*, the Supreme Court mentioned that a compact could comply with the milestone by permitting a private party to build a disposal facility. *See* 505 U.S. at 176, 112 S.Ct. at 2428. The Secretary, on the other hand, interprets "provide for" to mean something more than simply allowing waste to make its way out of the region.

■ We believe the Secretary's position is correct. Our first task in interpreting the fourth milestone is to pin down the plain meaning of the provision's language. In making that assessment we give words not defined in the statute their "ordinary, contemporary, common-meaning." *United States v. Kjellstrom*, 100 F.3d 482, 484 (7th

Cir.1996) (quoting *Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979)). The plain meaning of "provide" is to supply, afford, contribute, make, procure, or furnish for future use. *Black's Law Dictionary* 1224 (6th ed. 1990). *See also Midwest Interstate Low–Level Radioactive Waste Comm'n v. O'Leary,* 926 F.Supp. 134, 136 (D.Minn.1996); *Central Midwest I,* 858 F.Supp. at 118 (noting that the Commission could comply with the fourth milestone by "provid[ing] in advance" or "ma[king] plans" for disposal of the region's waste). After its Barnwell contract expired the Commission did not supply, afford, contribute, make, procure or furnish anything related to the disposal of the region's waste. Rather, the Commission sat back and let fate run its course. Then, after South Carolina happened to withdraw from the Southeast Compact and reopen Barnwell for 6 months, the Commission came up with the notion that its 1988 decision to lift the export ban (which was serving no purpose in the absence of a regional disposal site) somehow provided for full disposal of the region's LLRW. However, even the Commission agrees that its decision to permit generators to ship their waste out of the region, standing alone, would not have been sufficient to provide for disposal. Instead, the Commission bases its claim on the fact that Barnwell reopened. The problem is that South Carolina—not the Commission—made that call, and the fourth milestone clearly states that a compact is entitled to incentives only when *the compact* provides for disposal. *See* § 2021e(d)(2)(B)(iv).

We also reject the Commission's argument that because a compact could provide for disposal by permitting a private entity to open a disposal facility, the Commission must have complied with the fourth milestone. By allowing a third party to build and operate a disposal facility, a compact would certainly be supplying, procuring, furnishing, or making disposal capacity available to the region's generators. In this case the Commission did nothing of the sort. Finally, we note that the 1985 Act, like its predecessor, holds *states* and *compacts*—not *generators*—responsible for all waste generated within their borders. § 2021c(a)(1)(A). Here the Commission did not take any responsibility for the region's

waste. Rather, it simply relied on its 1988 decision to lift the export ban and hoped the generators would shoulder the responsibility for making sure their waste wound up at a proper facility.

The Commission also claims that negotiating a new contract would have been a "weak and feeble" gesture, as meaningless as it was impossible. But a new contract would have been neither impossible nor meaningless. First, the generators worked out deals with Barnwell, so nothing prevented the Commission from doing the same. Second, without a contract the generators' only protection would have been the dormant Commerce Clause. While that clause guarantees that South Carolina could not discriminate against out-of-state waste, it would not prevent the state from severely limiting the total amount of waste it would accept or even pulling the plug on Barnwell altogether. A contract could have guaranteed continued access or, at a minimum, provided an avenue of recourse if Barnwell scaled back or shut down its operation.

Next, the Commission tries to paint itself as the champion of public policy. It points out that it is required to use the incentive payments to develop a disposal site, while the generators, whom the Commission labels "the source of the problem," get the refunds with no strings attached. The Commission would have a much better argument if the surcharges were not styled as incentive payments. After all, Congress could have directly allocated the funds to the compacts without setting up a system of milestones. Instead, Congress decided to reward only those compacts which took steps toward developing regional disposal facilities. Additionally, as the district court noted, the Commission is essentially arguing for a return to the situation existing before Congress stepped in. That is, the Commission's interpretation leaves generators (armed only with the dormant Common Clause) to fend for themselves, gives states and compacts absolutely no incentive to increase disposal capacity, and hinders the development of a network of fairly and evenly distributed regional disposal sites. Such an interpretation would directly contradict the purposes of the 1985

Act. *Midwest,* 926 F.Supp. at 137; *see also Appalachian States,* 93 F.3d at 110–11.

Finally, the Commission makes a last-ditch effort to persuade us that the Secretary's interpretation renders the fourth milestone unconstitutionally vague. In support, the Commission cites *Pennhurst State School & Hospital v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981), which held that if Congress intends to attach a condition on the receipt of federal monies, it must do so unambiguously. That statement is certainly good law, but it has nothing to do with this case. Congress expressly attached a condition on states or compacts receiving incentive payments under the fourth milestone—they had to provide for disposal of all low-level radioactive waste generated within their borders. *New York,* 505 U.S. at 172, 112 S.Ct. at 2426 (noting that the "conditions imposed [by the milestones] are unambiguous" and satisfy *Pennhurst*). As a result, the issue in this case was not whether Congress imposed a binding condition—it clearly did—but rather what the proper "scope and interpretation" of that obligation should be. *American Hosp. Ass'n v. Schweiker,* 721 F.2d 170, 183 (7th Cir.1983), *cert. denied,* 466 U.S. 958, 104 S.Ct. 2169, 80 L.Ed.2d 553 (1984).

For these reasons, the judgment of the district court is

AFFIRMED.