735 A.2d 1173

IN THE MATTER OF WESTINGHOUSE ELECTRIC
CORPORATION—BLOOMFIELD

GENERATOR NO: NJ080100916
GENERATOR NO: NJR990041071.

Superior Court of New Jersey
Appellate Division

Argued April 21, 1999 (By telephone)—Decided August 31, 1999.

426

Before Judges LONG, KESTIN and CARCHMAN.

*Kevin J. Bruno,* argued the cause for appellant Westinghouse Electric Corporation (*Robertson, Freilich, Bruno and Cohen,* attorneys; *Mr. Bruno,* of counsel and, with *Lynne J. Urbanowicz–Mulcahy,* on the brief).

*Roger S. Haase,* Deputy Attorney General, argued the cause for respondent Low–Level Radioactive Waste Disposal Facility Siting Board (*John J. Farmer, Jr.,* Attorney General, attorney; *Joseph L. Yannotti,* Assistant Attorney General, of counsel; Mr. Haase, on the brief).

The opinion of the court was delivered by

KESTIN, J.A.D.

In June 1997, the Low–Level Radioactive Waste Disposal Facility Siting Board (the Board) in the Department of Environmental Protection imposed reduced assessments totalling $351,742.03 to cover Westinghouse Electric Corporation's (Westinghouse) fiscal years 1992, 1993 and 1994 funding responsibilities, as a generator of low-level radioactive waste, for the development of a disposal facility. The assessments were made pursuant to the Regional Low–Level Radioactive Waste Disposal Facility Siting Act (the Act), *N.J.S.A.* 13:1E–177 to –198, and administrative rules adopted thereunder, *N.J.A.C.* 7:60–1.1 to –1.6 (the Rules). Westinghouse appeals. We affirm.

Westinghouse has been licensed to handle low-level radioactive materials in connection with its own manufacturing operations and its involvement in projects of the federal government, such as the Manhattan Project. Until 1983, Westinghouse owned and operated a lamp manufacturing business in Bloomfield. In 1983, the manufacturing operation was sold to Phillips Lighting Company (Phillips). Westinghouse retained title to the property. Phillips continued manufacturing at the site until 1986, when all operations ceased. Once operations on the site came to an end, clean-up was required under standards imposed by federal and State law. Among other things, there was a need to dispose of low-level radioactive waste (LLRW). This has become an increasingly common industrial problem implicating environmental concerns and policies which have been addressed legislatively and administratively on both federal and state levels.

The Seventh Circuit Court of Appeals recently provided some background regarding the problem and how it has been approached:

> Millions of cubic feet of low-level radioactive waste are generated by power companies, industry, the government, universities, and hospitals each year. *See New York v. United States*, 505 *U.S.* 144, 149–50, 112 *S.Ct.* 2408, 2414, 120 *L.Ed.*2d 120 (1992). The main problem with this type of waste, which comes in forms ranging from luminous watch dials to nuclear power plant hardware, is that it often

needs to remain isolated for hundreds of years before it no longer poses any health risk.

In the late 1970's, as some of the dangers associated with the disposal of the waste came to light, half of the nation's disposal facilities closed their doors. By late 1978 only three sites—those in Washington, Nevada, and South Carolina—remained open. Then, in 1979, following a series of transportation and packaging mishaps, Washington and Nevada temporarily shut down their facilities. Less than eager to serve as the nation's dumping ground for radioactive waste, South Carolina severely cut back on the amount of waste it was willing to accept at its site. A crisis was at hand.

In 1980 Congress reacted to the crisis by enacting the Low–Level Radioactive Waste Policy Act, *Pub.L.* 96–573, 94 *Stat.* 3347. The 1980 Act announced a federal policy of holding each state responsible for "providing for the availability of capacity ... for the disposal of low-level radioactive waste generated within its borders." Because Congress concluded that disposal could be managed most efficiently at a regional level, the 1980 Act encouraged states to form interstate compacts. Starting in 1986, these compacts, after being ratified by Congress to take the dormant Commerce Clause out of the picture, could prohibit outside waste from entering their regions' disposal facilities.

The 1980 Act was largely a flop. By 1985, although most states had joined compacts, only the three formed around Washington, Nevada, and South Carolina—the states with facilities in operation before the Act was passed—had disposal sites. Congress realized that if it ratified the compacts as planned, the three sited compacts could have started excluding outside waste in 1986, and as many as 31 states would have been left without access to a disposal facility.

To head off a second disposal crisis, Congress passed the Low–Level Radioactive Waste Policy Amendments Act of 1985. The 1985 Act was largely the product of a compromise worked out by the nation's governors, and part of the legislation took a familiar tack. For example, like its predecessor, the 1985 Act declared that "[e]ach State shall be responsible for providing, either by itself or in cooperation with other States, for the disposal of ... low-level radioactive waste generated within the State." [*U.S.C.A.*] § 2021c(a)(1)(A). Similarly, the 1985 Act made clear that Congress thought regional compacts would be the safest and most efficient way to increase disposal capacity and ensure uniform distribution of disposal sites. *See* [*U.S.C.A.*] § 2021d(a).

However, part of the legislation took an aggressive approach absent in the 1980 Act. Under the new act, the three sited states were required to accept low-level radioactive waste generated outside of their borders until 1992. [*U.S.C.A.*] § 2021c(a)(2). In exchange, the sited states were allowed to assess graduated surcharges on outside waste. [*U.S.C.A.*] § 2021e(d)(1). Then, when the 7 years were up, the sited states would be allowed to exclude out-of-state waste. In order to encourage unsited states to meet their responsibility for disposing of their own waste by 1992, the 1985 Act set forth three different types of incentives—monetary, access, and a take-title requirement. *See New York, supra*, 505 *U.S.* at 144, 112 *S.Ct.* 2408, 120 *L.Ed.*2d 120 (describing the incentives and striking down a

provision requiring noncomplying states to take title to all waste generated within their borders).

[*Central Midwest Interstate Low–Level Radioactive Waste Commission v. Pena,* 113 *F.*3d 1468, 1470–71 (7th Cir.1997).]

Following on the federal legislative efforts, New Jersey, in 1987, adopted its Act, designed, *inter alia,* to generate funds for the construction of a waste disposal facility within New Jersey. *N.J.S.A.* 13:1E–177 to –198. The legislative statement appended to the bill during the enactment process stated in part:

This bill requires the board to develop criteria and guidelines for the siting of a low-level radioactive waste disposal facility that are designed to prevent adverse public health, environmental, or economic impacts resulting from the location of the facility, including impacts from the transportation of waste to the facility.

\* \* \* \*

The bill requires the board to ... develop and adopt a Low–Level Radioactive Waste Disposal Plan, which shall include: an inventory of current and anticipated wastes and waste generators in the region, a technical analysis of waste disposal methods, and an analysis of transportation routes and the "waste stream" to a facility.

[Assembly Energy and Environmental Committee Statement, Senate No. 1275, *L.* 1987, *c.* 333.]

The Legislature formally stated its findings and declarations in the body of the Act:

The Legislature finds that Congress, pursuant to the "Low-Level Radioactive Waste Policy Act," *Pub.L.* 96–573 (42 *U.S.C.A.* § 2021b *et seq.*) and the "Low–Level Radioactive Waste Policy Act Amendments of 1985," *Pub.L.* 99–240 (42 *U.S.C.A.* § 2021d *et seq.*), has declared that, after January 1, 1986, each state shall be responsible for providing capacity for the proper disposal of low-level radioactive waste generated within its borders, except for waste generated as a result of atomic energy defense activities; that because the management and disposal of radioactive waste would be handled most safely and efficiently on a regional basis, New Jersey, pursuant to *P.L.* 1983, *c.* 329, (*C.* 32:31–1 et al.), has entered as a party state into the Northeast Interstate Low–Level Radioactive Waste Management Compact; and that among the obligations of each party state to that compact is the duty to establish a mechanism for the timely siting of a disposal facility within its jurisdiction in the event that it is designated as host state for the regional facility.

\* \* \* \*

The Legislature further finds and declares that the most effective, most efficient, and most equitable way to accomplish this purpose is to establish an independent

board of experts in the relevant disciplines charged with siting the regional low-level radioactive waste disposal facility in accordance with a procedure which offers the maximum opportunities for the informed participation of the general public, and of the citizens of the local communities prospectively impacted, and with supervising the design, construction, and operation of the facility, all as hereinafter provided.

[*N.J.S.A.* 13:1E–178.]

The Board's authority, initially established by *L.* 1987, *c.* 333, was expanded by *L.* 1991, *c.* 166. As codified in *N.J.S.A.* 13:1E–181, the Board is authorized, in addition to its other powers:

n. To maintain oversight and supervision of the construction, maintenance, operation, closure, and post-closure observation and maintenance of a facility sited pursuant to the provisions of this act; and

o. To assess and collect fees from generators sufficient to meet all expenses incurred . . . in implementing . . . this act.

On November 18, 1991, the Board published proposed rules and invited public comment, as required by the Administrative Procedure Act, *N.J.S.A.* 52:14B–4. The Board's statement accompanying this rule proposal further elucidated the design of the funding mechanism that had been generally authorized by the Act and which was specifically advanced in the proposed rules:

The Siting Act created an 11–member Board and a 13–member Advisory Committee to site, develop and oversee operation of a low-level radioactive waste disposal facility in New Jersey. In general, the board is responsible for establishing siting criteria, developing a disposal plan, establishing a siting process, siting and ensuring the construction, operation and closure of the low-level radioactive waste disposal facility, and developing a public information program.

\* \* \* \*

In October 1990, amendments to the Siting Act were introduced which authorized the Board to require New Jersey generators to report low-level radioactive waste information; to oversee construction, operation and closure of a disposal facility; and to assess the generators for the cost of developing a low-level radioactive waste disposal facility, and implementing State and Federal laws concerning low-level radioactive waste. This legislation (P.L.1991, c. 166) was signed into law on June 19, 1991. The proposed new rules are intended to implement the amendments to the Siting Act.

The proposed new rules provide a mechanism to obtain funds which are essential for the siting, development, licensing and construction of a low level radioactive waste disposal facility in accordance with Federal and State law. The rules provide a mechanism to fund the costs of the siting process including the cost of

consultant services to perform the technical siting, development, licensing and construction work, and staff to oversee the process.

\* \* \* \*

The Board proposes to base the establishment of fees on the concept of recent use of the three existing disposal sites by each generator, and the potential disposal capacity needs with respect to the decontamination and decommissioning of nuclear power plant units.

\* \* \*

The proposed fee will be calculated principally on the volume and radioactivity of the low-level radioactive wastes produced. A generator who produced greater volume and/or greater radioactivity of waste requiring disposal will be assessed a larger fee than a generator who produced less. The information base for determining volume and radioactivity of waste disposed in a low-level radioactive waste disposal facility will be obtained from the disposal manifests accompanying waste shipments to the three existing disposal sites as maintained on the National Information Management System operated by the U.S. Department of Energy's Low–Level Waste Management Program. \* \* \*

For the first assessment, which will generate fees to cover fiscal years 1992 and 1993 costs, the Board will utilize the disposal volume and radioactivity data compiled by the National Information Management System for the years 1988, 1989 and 1990. For the second assessment, which covers the fees for fiscal year 1994, the Board will utilize 1989, 1990 and 1991 data. For the third assessment, which covers fiscal year 1995, the Board will utilize 1990, 1991 and 1992 data.

Many facilities which utilize radioactive material will r[e]quire some decontamination and decommissioning which will lead to the production of waste requiring disposal as low-level radioactive waste. With the exception of the nuclear power plant units, it is not known at this time which other facilities will undergo decontamination and decommissioning. \* \* \*

Because the Board has determined to take into account the impact of potential decontamination and decommissioning, as set forth in the Disposal Plan, on the development of the disposal facility, the Board will assess the nuclear power plant units an additional fee for the potential decontamination and decommissioning wastes.

\* \* \* \*

The Board recognizes there is the issue of generators who will use the new disposal facility, but have not participated in paying for the development of the facility. The Board intends to evaluate this issue in the future and will consider the feasibility of imposing surcharges on such generators as well as providing credits for those generators who have participated in paying for the development of the disposal facility.

\* \* \*

The proposed new rules will also have a positive social impact because they place the financial burden of supporting the siting and development of a low-level radioactive waste disposal facility on those who generate the wastes rather than on the general public via General State Funds.

\* \* \* \*

In developing these rules, the Board has balanced the need to protect the environment against the economic impact of the proposed rules and has determined that to minimize the impact of the rules on small businesses would endanger the environment, public health and public safety, and therefore, no exemption from coverage is provided. The Board has determin[ed] that the amount of low-level radioactive waste produced by each generator, rather than the size of the business, will provide a sound basis for the fee determination.

[23 *N.J.R.* 3410, 3411–15 (November 18, 1991).]

After adopting the Rules in 1992, the Board applied them to assess Westinghouse $531,584.80 for fiscal years 1992 and 1993, based on LLRW generation in 1988, 1989 and 1990. Westinghouse was one of ninety-six generators of LLRW assessed in those fiscal years for calculated shares of the budgeted costs of siting and developing an LLRW disposal facility. A second assessment of $177,167.74 followed for fiscal year 1994, which used 1989, 1990 and 1991 data as its basis. 108 generators were assessed in that fiscal year. No assessments were made subsequently because, according to the Board in its brief on appeal:

When preparing and adopting a budget each year, the ... Board reviews debts and surpluses to determine the amount of fees to be collected from the generators for the next fiscal year. When unspent funds are carried forward or other sources of funds are available, the amount of fees is reduced accordingly.

Westinghouse objected to both of the assessments on the ground that it was not a "generator" under the Act. Westinghouse also requested a recalculation, *see N.J.A.C.* 7:60–1.5(f), because a portion of the LLRW on which the assessment was based had been generated by Westinghouse's involvement in uranium production activities of the Manhattan Project, exempt under the definition of LLRW in *N.J.S.A.* 13:1E–179i and *N.J.A.C.* 7:60–1.2.

In 1997, the Board informed Westinghouse that the assessments had been recalculated based on information which Westinghouse

had supplied regarding its participation in the Manhattan Project. The total assessment was reduced on this basis from $708,752.54 to $351,742.03. Westinghouse's appeal is from the reassessment.

Westinghouse raises two related issues on appeal: that the fee assessments are contrary to legislative intent, and that the Board's fee assessment rule was arbitrary and capricious in imposing a cost for future development against entities which will not be generating LLRW in the future. We reject both arguments.

For the sake of factual completeness, we note that Westinghouse has acknowledged that, in connection with clean-up of its site, 7,100 cubic feet of LLRW was disposed of in 1989 and 1990 at the Barnwall, South Carolina disposal facility referred to in *Central Midwest, supra,* 113 *F*.3d at 1470. Westinghouse alleges, however, that its clean-up activities are virtually completed and that it has had and will have no need to dispose of LLRW in years beyond those for which the assessments were made.

The argument based on legislative intent focuses on a portion of the definition of "generator" identically contained in both the Act, *N.J.S.A.* 13:1E–179n, and the Rules, *N.J.A.C.* 7:60–1.2:

"Generator" means any person, association, public utility, hospital, clinic, research laboratory, corporation, society, radiopharmaceutical facility, academic facility, or nuclear medical research facility that produces low-level radioactive waste, ...

Westinghouse omits, however, to set out the rest of that definition:

... or *any other entity* identified by the board that produces low-level radioactive waste, or *that is licensed by the United States Nuclear Regulatory Commission to use, possess, handle or dispose of radioactive materials.*

[*N.J.S.A.* 13:1E–179n; *N.J.A.C.* 7:60–1.2 (emphasis supplied).]

Westinghouse's argument is that it did not "produce" LLRW in 1988–1991, and had not done so since 1986, at the latest, when the property it owned ceased being used as a manufacturing facility. We reject that argument as inapposite, for it fails to take adequately into account clear State legislative purposes and designs associated with the provisions before us viewed through the lens of the history recounted in *Central Midwest* and other sources. That history strongly suggests that the term "produce" as used in the Act and Rules means "produce for disposal," rather

than "create" as essentially contended by Westinghouse. The problems which the Act and its federal counterparts were designed to deal with arise from the difficulties of disposing of LLRW, not just from creating it. Only one construction makes sense: that a "generator" of LLRW is one who produces it for disposal irrespective of when it was created.

■ In reaching this conclusion, we adopt the Supreme Court's general approach in *In re Adoption of N.J.A.C. 7:1I*, 149 *N.J.* 119, 693 *A.*2d 97 (1997), although we view the result reached there not to affect the outcome in this matter (as Westinghouse contends it should) because of many distinguishing factors:

> In construing a statute, the primary task is to " 'effectuate the legislative intent in light of the language used and the objectives sought to be achieved.' " *Merin v. Maglaki*, 126 *N.J.* 430, 435, 599 *A.*2d 1256 (1992) (quoting *State v. Maguire*, 84 *N.J.* 508, 514, 423 *A.*2d 294 (1980)). "[S]tatutes are to be read sensibly rather than literally and the controlling legislative intent is to be presumed as 'consonant to reason and good discretion.' " *Schierstead v. Brigantine*, 29 *N.J.* 220, 230, 148 *A.*2d 591 (1959) (quoting *Morris Canal & Banking Co. v. Central R.R. Co.*, 16 *N.J.Eq.* 419, 428 (Ch. 1863)); *see also Guiseppi v. Walling*, 144 *F.*2d 608, 624 (2d Cir.1944) (Hand, J.) ("There is no surer way to misread any document than to read it literally.")

> [*Id.* at 127–28, 693 *A.*2d 97.]

■ There is an additional, more encompassing, basis for holding Westinghouse to be covered, however. It comes from the highlighted portion of the definition of "generator" which Westinghouse has omitted to present. A straightforward reading in the face of the background which has been provided in the record on appeal leads to only one conclusion: Westinghouse is covered as an "entity [in this State] ... licensed by the United States Nuclear Regulatory Commission to use, possess, handle or dispose of radioactive materials." *N.J.S.A.* 13:1E–179.

■ We also reject the second argument advanced, that it is unreasonable to assess fees against Westinghouse for the development of a disposal facility it will never use, because Westinghouse is no longer creating LLRW and will have no new LLRW to dispose of in the future. We see nothing necessarily arbitrary, capricious or unreasonable about generating the costs of develop-

ing a future disposal facility from entities whose past activities are in a class of those which have resulted in the current or anticipated unavailability of previously accessible disposal sites, or have rendered future use inadvisable. We furthermore discern nothing arbitrary, capricious or unreasonable in the use of the benchmark years for these assessments.

■ In its reply brief, Westinghouse advances an additional argument for relief from the assessments: "because the ... Board has suspended the process of siting and constructing [an LLRW] disposal facility" and has, in fact, adopted a resolution to return funds to the generators. We note, however, that Governor Whitman has vetoed this resolution as premature in advance of the "prepar[ation of] a comprehensive plan and explor[ation of] all options for the short and long term needs for the funds with sufficient input from affected parties before returning the funds." We see no reason why Westinghouse should be governed by different standards than other generators of LLRW. Westinghouse has, for more than a half-dozen years enjoyed the benefits of delay by reason of its objections and this litigation. Now that we have determined the assessments against Westinghouse to have been valid, that company should comply, forthwith, to discharge its payment responsibilities, as other generators doubtless have, and await further developments as all generators must.

Because we have rejected, on the merits, Westinghouse's arguments to invalidate the assessments against it, we need not address the Board's argument that "Westinghouse should be precluded from challenging the fee assessment rule at this late date when it failed to participate in the rulemaking process at the appropriate time."

Affirmed.